NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a1209n.06

Nos. 11-2010, 11-2048

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Nov 21, 2012*

DEBORAH S. HUNT, Clerk

)
LANIER MCPHERSON,                                  )
                                                   )
    Petitioner-Appellee/Cross-Appellant,       )
                                                   )
v.                                                 )
                                                   )  ON APPEAL FROM THE UNITED
JEFFREY WOODS,                                     )  STATES DISTRICT COURT FOR THE
                                                   )  EASTERN DISTRICT OF MICHIGAN
    Respondent-Appellant/Cross-                )
    Appellee.                                  )

Before:  GIBBONS and COOK, Circuit Judges; and ROSENTHAL, District Judge[*].

**JULIA SMITH GIBBONS, Circuit Judge.**  This appeal arises out of the district court's grant of *habeas corpus* to a Michigan prisoner.  The petitioner-appellee and cross-appellant, Lanier McPherson ("McPherson"), was convicted by a jury in Wayne County Circuit Court of first-degree murder, felon in possession of a firearm, and possession of a firearm during the commission of a felony.  The district court granted his *habeas corpus* petition pursuant to 28 U.S.C. § 2254 on his Fifth Amendment claim but denied his petition on all other grounds.  The Warden, Jeffrey Woods, appeals the grant of *habeas corpus*, and McPherson cross-appeals the denial of his petition on the remaining grounds.  Based on the reasons that follow, we reverse the district court's grant of *habeas corpus* on McPherson's Fifth Amendment claim and affirm the district court's denial of *habeas corpus* on all other grounds.

---

[*]The Honorable Lee H. Rosenthal, United States District Judge for the Southern District of Texas, sitting by designation.

**I.**

On August 19, 2000, four men went to a funeral home in Detroit to attend a funeral: Lanier McPherson, Cherell King[1], Delano Gaffney, and Marcell Dorsey. McPherson traveled to the funeral with his girlfriend, Lucretia Thompson, his uncle, and Cherell King. When McPherson arrived, he had a gun with him. He told Thompson the gun was not his and asked her to take the gun home with her.

At some point during the day, Gaffney's car was stolen from the funeral home parking lot. King told officers that when Gaffney realized this, he remembered seeing two men walking on West Grand Boulevard whom he suspected of stealing his car. Gaffney asked McPherson to have Thompson bring Gaffney's gun back to him, which McPherson did. At that time, Dorsey, Cherell King, Gaffney, and McPherson all got into Dorsey's Jeep and drove down West Grand Boulevard. Dorsey's Jeep approached the two men, Abdul Scott and Max King, at the corner of West Grand Boulevard and Linwood Avenue. Two of the passengers in Dorsey's Jeep jumped out of the vehicle. Scott and King were shot—Scott five times and King twice. King survived the shooting. Scott did not.

**A.**

Cherell King and McPherson were arrested for an unrelated crime approximately three months after the shooting, on November 22, 2000. The next day, Investigator Barbara Simon arrived at 1300 Beaubien, where McPherson was being held, to interview him about the shooting

---

[1]Throughout this opinion, to avoid confusion, we will refer to Cherell King as "Cherell King" and to Max King as "King."

of Scott and King. McPherson initialed a document informing him of his right to have an attorney present. Later, at a state court *Walker*[2] hearing, Simon testified that McPherson "said he didn't know anything about it and he didn't want to talk. And after a while, I believe I took him back up on the ninth floor." Simon testified that McPherson had said "fuck this, fuck you, I don't want to talk." At that same hearing, McPherson testified that Simon "kept asking me questions and I said I don't want to talk, I want a lawyer. She told me the big, bad, lawyer talk doesn't scare her, I don't run anything in Squad 7." Simon did not attempt to speak with McPherson again.

The next day, Cherell King was interviewed and gave a statement implicating McPherson. After learning of this statement, on November 24, Investigator James Fisher testified at trial that he went to interview McPherson. McPherson testified at the *Walker* hearing that he initially told Fisher that he wanted a lawyer and that he did not want to talk to Fisher. Both men acknowledge that Fisher then gave McPherson a Constitutional Rights Certificate of Notification before beginning to take a formal statement, which McPherson read aloud and initialed. Fisher took contemporaneous notes, which McPherson also reviewed and initialed at the conclusion of the interview. In his statement, McPherson asserted that he gave the gun Thompson brought back to the funeral home to Gaffney. Gaffney then put the gun in Cherell King's hand and said, "smoke both of them." Disbelieving McPherson's statement, Fisher set up an appointment for McPherson to take a polygraph examination with Investigator Andrew Sims, a polygraph examiner with the Detroit Police Department.

---

[2]In Michigan, a *Walker* hearing is an evidentiary hearing conducted to determine whether a confession was involuntarily made. *See generally People v. Walker*, 132 N.W.2d 87 (Mich. 1965).

McPherson testified at the *Walker* hearing that the next day, November 25, an unnamed investigator entered his holding area. McPherson testified that he asked, "what happened to the lawyer I asked for and I thought I was getting off." McPherson recalled the investigator saying "yeah, yeah" and walking off.

On November 26, Sims gave McPherson a polygraph examination. Before beginning the examination, McPherson signed a waiver of his *Miranda* rights. Sims initially disbelieved McPherson's account of the events during the polygraph examination and told him so. At that point, McPherson told Sims that he would tell the truth. Sims testified at trial that during that statement, McPherson said that he "fired a couple of shots, because they were reaching as though they were armed. And [McPherson] shot him and left the scene." McPherson gave the following statement to Sims:

> I, Lanier McPherson, was only going, trying to ask the two guys had they seen a Chevy that had been stolen from a funeral home? And while doing so, the guys became hostile, and began to reach like they had weapons. So, I fired the gun at them, only to scare them away, because I didn't want to be hurt by them or any weapons they were trying to pull out.

After completing his interview with Sims, McPherson was transported by Investigator Dwight Pearson back to 1300 Beaubien, where he was being held. McPherson made the following statement to Investigator Pearson (read at trial from Investigator Pearson's notes memorializing the statement):

> Q [by Investigator Pearson]: Tell me what happened over at Linwood and West Grand Blvd.

A [by McPherson]: "(Hondo),[3] . . . Delano Gaffney, while over at Cole's Funeral Home, stated that there was two guys walking down West Grand Blvd. that knew something about this car he had that was stolen. He asked us, did anyone have a heater [gun] on them. That's when I called my girlfriend and told her to bring my nine millimeter up to the funeral home. It took her five to ten minutes to get up to the funeral home. After the gun was brought up to the funeral home, Tick, which is [Cherell] King, Hondo, and myself got into Dune's, which is Marcel Dorsey, Jeep Grand Cherokee and went riding around looking for both Hondo's car and two guys that were walking down West Grand Blvd. While riding, we saw the two guys walking on West Grand Blvd. So, Dune stopped the Jeep at the corner of Linwood and West Grand Blvd. I got out to ask the two guys about Hondo's car, because Hondo was upset. When I walked over to the two guys, I asked them have they seen a gold Chevy with twenties? They said, no, dog, we haven't seen one, and that they didn't know what I was talking about. I asked them where they were walking."

Q [by the prosecutor]: While they were walking?

A [by Pearson]: I asked, yes, that's right. [Pearson again narrating McPherson's statement]: "I asked them, while they were walking, did they see one? They said, dog, we told you that we didn't see no car. That's when one of the guys put his hand under his shirt. And the other guy put his hands in his pocket. That's when I pulled out my nine millimeter, and fired about nine shots at them. After I fired the shots, I got back into the Jeep and we left."

Q [by Pearson]: Where is the nine millimeter at now?

A [by McPherson]: "I don't know. Tick sold it."

Q: Did you know who Tick sold the gun to?

A: "No."

Q: What color is the Jeep Grand Cherokee?

A: "Brown, four door."

Q: What did you do with the gun after you shot the two guys?

---

[3] Statements attributed to McPherson are placed in quotation marks.

A: "I gave it to Tick, and they said they would get rid of it."

Q: Who was driving the Jeep?

A: "Dune."

Q: What color was the nine millimeter?

A: "A stainless steel."

**B.**

McPherson sought to suppress his statements on the grounds that (1) the police failed to scrupulously honor McPherson's invocation of his right to counsel; (2) the police continued to question McPherson after he invoked his right to remain silent; and (3) McPherson's statement was involuntary and taken in a coercive environment. After the *Walker* hearing referred to earlier, at which Simon, Fisher, Sims, Pearson, and McPherson all testified, the trial court denied the motion to suppress, reasoning:

> But the bottom line here is the period of detention and the totality of the circumstances and whether I believe that it was a violation there. And as I look at everyone's testimony and apply the *Slocum* and *Mosley* and *Cipriano* and *Walker* and *Twomey* and the federal cases that I alluded to, and the standards of *Cipriano* as I go one-by-one, while I have some concerns, the motion to suppress I'm going to deny.

McPherson's first trial ended in a mistrial as a result of a hung jury. On April 24, 2002, after a second trial, the jury returned a verdict of guilty on all three counts: first degree murder, in violation of Mich. Comp. Laws § 750.316(1)(a); felon in possession of a firearm, in violation of Mich. Comp. Laws § 750.224f; and possession of a firearm during the commission of a felony, in violation of Mich. Comp. Laws § 750.227b. On May 9, 2002, McPherson was sentenced to thirty years to life

on the first degree murder charge, thirty-eight months to five years on the felon in possession charge, and five years on the felony firearm charge.

## C.

McPherson then appealed his convictions and sentences to the Michigan Court of Appeals, alleging that his rights under the United States and Michigan Constitutions were violated by (1) the introduction of a deceased co-defendant's custodial statement incriminating McPherson; (2) the admission of McPherson's confession, which was involuntary and taken after the police failed to honor his request for counsel; (3) the trial court's limitation of defense counsel's cross-examination of the prosecution's eyewitness, Montez Meadows; (4) the polygraph examiner's unresponsive testimony that innocent people never confess and counsel's failure to object to that comment; and (5) the prosecutor's improper comment that a witness who implicated McPherson was "found dumped in Hamtramck with a bullet in his head."

On July 20, 2004, the Michigan Court of Appeals affirmed McPherson's convictions and sentences. As to McPherson's first claim, the court acknowledged that *Crawford v. Washington*, 541 U.S. 36 (2004), precludes the admission of testimonial out-of-court statements where the witness is unavailable and the defendant did not have "a prior opportunity for cross-examination" of the declarant. However, it held that evidence of the deceased Cherell King's statement was introduced not for the truth of the matter asserted, but rather to show "that defendant was aware of [Cherell] King's statement in light of defendant's testimony that King was the shooter and as part of the prosecutor's theory that defendant changed his story several times and could not be believed." Therefore, the use of Cherell King's testimonial statement to police that McPherson was the shooter

did not violate McPherson's Sixth Amendment right to confront the witnesses against him, and the trial court's admission of that statement did not constitute reversible error.

As to McPherson's second claim that his confession was improperly admitted, the court held that McPherson's Fifth Amendment rights were preserved because (1) his statements were voluntarily made and (2) he failed to establish that his Fifth Amendment right to counsel was violated. The court of appeals credited the trial court's credibility findings, noting that they were resolved against McPherson.

As to McPherson's third claim that the trial court improperly limited defense counsel's cross-examination of Montez Meadows, the court held that defense counsel did not properly preserve the issue for appeal because he did not specifically object at trial on this ground, nor did he articulate what evidence he was unable to present because of the limitation. Reviewing for plain error, the court held that McPherson failed to show that he was "denied a reasonable opportunity to test the truthfulness of Meadows's testimony on any material issue."

As to McPherson's fourth claim that the polygraph examiner, Sims, gave unresponsive testimony that innocent people never confess, the court held that McPherson waived his right to review on that claim because McPherson sought opinion testimony from Sims about interview techniques. As a result, the court held that McPherson "invited" the error, failed to object, and thereby waived review.

As to McPherson's fifth claim, that the prosecutor engaged in misconduct through his comment that a witness who implicated McPherson was "found dumped in Hamtramck with a bullet in his head," the court held that any error by the prosecutor was cured by the trial court's jury

instruction that "[t]he lawyers' statements or arguments, they are not evidence." Therefore, this claim was also denied. McPherson then sought leave to appeal to the Michigan Supreme Court, but was denied.

**D.**

McPherson filed a *habeas* petition in the Eastern District of Michigan. He later filed a motion to stay the proceedings to allow him to return to state court to exhaust additional claims. On February 1, 2007, the district court entered an order granting McPherson's stay, provided that he present his claims in state court within sixty days of the date of entry of the order and that he return to federal court to lift the stay within sixty days of exhausting his state court remedies. McPherson presented his claims in state court by filing a motion for relief from judgment on August 27, 2007—nearly five months after the expiration of the deadline set by the district court. This motion was denied by the state trial court. The Michigan Court of Appeals denied McPherson's "delayed application for leave to appeal." On September 28, 2009, the Michigan Supreme Court refused to grant leave to appeal the order of the Michigan Court of Appeals, rendering McPherson's claims exhausted. On November 30, 2009, McPherson, through his attorney, timely filed a motion seeking to lift the stay of his *habeas corpus* proceedings in district court. That motion was granted by the district court on February 5, 2010.

McPherson's amended petition sought relief on the basis of the following alleged violations of his constitutional rights: (1) the introduction of a deceased co-defendant's custodial statement incriminating McPherson; (2) the trial court's limitation of defense counsel's cross-examination of Montez Meadows; (3) prosecutorial misconduct; (4) the polygraph examiner's unresponsive

testimony that innocent people never confess; (5) the admission of McPherson's confession, which was involuntary and taken after the police failed to honor his request for counsel; and (6) ineffective assistance of counsel.

On July 25, 2011, the district court entered an order granting McPherson's petition pursuant to 28 U.S.C. § 2254, on the ground that McPherson's Fifth Amendment rights were violated when the police continued to question him after he invoked his right to counsel. As a result of that questioning, McPherson made statements to Sims and Pearson that he shot the victims in self-defense. At trial, he denied shooting the victims. Because of the improper admission of McPherson's prior statements, the district court held that the state courts' decisions holding that McPherson's rights were not violated were unreasonable.

In granting the petition, the district court reasoned that McPherson "presented clear and convincing evidence to rebut any express or implicit finding of fact that Petitioner did not make an unequivocal request for counsel." The court noted that the record did not support the factual finding that McPherson never invoked his right to counsel. Neither Simon nor Fisher denied that McPherson requested to speak with an attorney, and McPherson testified at the *Walker* hearing that he requested to speak to an attorney and was denied that right. Finally, the district court interpreted the trial court's comments to indicate an "implicit" finding that McPherson *had* invoked his right to counsel, citing to one comment in particular:

> Now, in a homicide case, I would think that they'd go to great lengths to ensure that he's represented by Counsel, that honor any requests that he made, if he in fact made them.

**II.**

In *habeas corpus* proceedings, we review a district court's legal conclusions *de novo*. *Montgomery v. Bobby*, 654 F.3d 668, 676 (6th Cir. 2011) (*en banc*). When, as here, the district court did not conduct an evidentiary hearing and relied solely upon the state court record, we review the district court's factual findings *de novo*. *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007).

Under AEDPA,

[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Pursuant to the "contrary to" clause of § 2254(d)(1), "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). Under the "unreasonable application" clause of § 2254(d)(1), a federal *habeas* court may grant the writ if the state court's application of clearly established federal law to the facts of the prisoner's case was objectively unreasonable in light of the evidence presented in the state court proceedings. *Id.* at 409–11. Importantly, "an *unreasonable*

application of federal law is different from an *incorrect* application of federal law." *Id.* at 410. Finally, under the "unreasonable determination" clause of § 2254(d)(2), federal courts must bear in mind that "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 130 S. Ct. 841, 849 (2010).

Section 2254(d), as amended by AEDPA, is a "purposefully demanding standard." *Montgomery*, 654 F.3d at 676 (citing *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011)). To obtain relief, a *habeas* petitioner must "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786–87. This "highly deferential standard . . . demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*)).

Under the doctrine of *Harrington v. Richter*, summary denials of claims are generally considered to be decided on the merits and enjoy AEDPA deference. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 131 S. Ct. at 784–85; *see also Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (holding that, in the absence of a reason to think some other explanation is more likely, a summary denial of review from Michigan's appellate courts is a decision on the merits and is entitled to AEDPA deference).

As to factual findings, a *habeas* petitioner bears the burden of rebutting, by clear and convincing evidence, the presumption that the state court's factual findings are correct. 28 U.S.C. § 2254(e)(1). Only factual determinations that are "'objectively unreasonable in light of the evidence presented in the state-court proceeding'" will be overturned. *McKinney v. Ludwick*, 649 F.3d 484, 488 (6th Cir. 2011) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

## A.

The Warden argues that McPherson's petition should have been dismissed by the district court as untimely because he failed to comply with the district court's order of February 1, 2007 in which McPherson's timely-filed petition was stayed to allow him to exhaust his claims in state court. The district court required that McPherson "present his claims in state court within sixty days from the date of this Order [or] the Court will dismiss the petition for writ of habeas corpus without prejudice." McPherson gives a list of reasons why he failed to comply with the February 1 order. The Warden notes in his opening brief that McPherson filed his motion for relief from judgment "over six months" after the date given by the district court. Other than that brief mention, this argument is exclusively developed in the Warden's reply brief. In light of this perfunctory treatment of this issue, we conclude that the Warden has waived the issue of McPherson's timeliness in filing his petition. *See United States v. Johnson*, 440 F.3d 832, 845–46 (6th Cir. 2006) (noting that "'an appellant abandons all issues not raised and argued in its initial brief on appeal'" (quoting *United States v. Still*, 102 F.3d 118, 122 n. 7 (5th Cir. 1996)) and that "'it is a settled appellate

rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" (quoting *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996))).

## B.

In its decision granting *habeas* relief, the district court noted that the trial court never made an explicit factual finding that McPherson did not invoke his right to counsel. It held that the record before the state court "supports a factual finding" that McPherson did invoke his right with Simon and Fisher and that they failed to honor this invocation, in clear violation of *Edwards v. Arizona*, 451 U.S. 477 (1981).

The district court conducted the wrong analysis. As noted above, factual findings by the state court enjoy a presumption of correctness, which can only be overcome by clear and convincing evidence to the contrary. *Miller-El*, 537 U.S. at 340. This presumption is not exclusive to a state court's explicit findings, but also applies to those implicit findings of fact that are inherent in its resolution of conflicting evidence. *Marshall v. Lonberger*, 459 U.S. 422, 433 (1982); *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996) (noting that implicit findings are also presumed to be correct "because of the trial court's ability to adjudge the witnesses' demeanor and credibility").

McPherson argues that the police continued to interrogate him after he invoked his right to counsel. During the course of a two-day evidentiary hearing before the state trial court, none of the investigators were asked, nor did they testify, whether such an invocation

ever took place. Under *Edwards*, the police may not further interrogate a custodial suspect who has invoked his right to counsel unless the suspect initiates additional communication. 451 U.S. at 484. However, "[i]f an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation, . . . or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." *Berghuis v. Thompkins*, 130 S.Ct. 2250, 2259–60 (2010) (quoting *Davis v. United States*, 512 U.S. 452, 459 (1994)). Therefore, the trial court's analysis in denying McPherson's motion to suppress *necessarily* required a credibility determination—whether McPherson's testimony that he invoked his right to counsel could be believed. The trial court addressed this fact expressly in announcing its ruling:

> Some of the inconsistencies in Mr. McPherson's statements, that troubles me. He took the stand to testify and to tell his version and I listened very carefully to what he had to say. Some of the things he said, I think his responses were very candid with the Court and I credit him with that. Some of the things that were said don't make sense and that was what my line of questioning to Mr. McPherson revolved around.

The trial court further noted, "If I'm to believe the police version, he never requested an attorney or a phone call."

The district court is correct that the state trial court never articulated its finding that McPherson did not invoke his right to counsel, and the majority of the state trial court's statements addressed its finding that the confessions were voluntarily made. However, a contrary factual finding would have required suppression of McPherson's statement and we, as a reviewing court, are permitted to reason backward from a legal conclusion to establish

-15-

the factual findings that sustain it. *See Lonberger*, 459 U.S. at 434 ("The trial court's ruling allowing the record of conviction to be admitted into evidence . . . is tantamount to a refusal to believe the testimony of respondent."). The district court's conclusion that the trial court "implicitly found that Petitioner had invoked his right to counsel" is plainly foreclosed by the trial court's denial of McPherson's motion to suppress.

Moreover, any ambiguity created in the state trial court was resolved in the Michigan Court of Appeals decision, which held that the trial court's ruling "turned principally on credibility issues, which were resolved against defendant." The Michigan Court of Appeals went on to hold that McPherson "has not established that his Fifth Amendment right to counsel was violated." The United States Supreme Court has held that a state appellate court's determination of the trial court's factual findings is, itself, entitled to deference. *Parker v. Dugger*, 498 U.S. 308, 320 (1991) ("[W]e conclude that a determination of what the trial judge found is an issue of historical fact."). It was not unreasonable for the Michigan Court of Appeals to defer to the credibility determination of the trial judge. The law of the Supreme Court, the Sixth Circuit, and the state of Michigan all call for deference to trial judges on matters of witness credibility under these circumstances. *See Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011) ("The trial court's [credibility] determination is entitled to great deference, and must be sustained unless it is clearly erroneous.") (internal citation and quotation marks omitted); *Fields v. Bagley*, 275 F.3d 478, 485 n.5 (6th Cir. 2001) ("When considering a motion to suppress, the trial court is the primary judge of the credibility of

witnesses and the weight of the evidence. If the trial court's findings are supported by competent and credible evidence, then the appellate court must accept them.") (internal citation omitted); *People v. Sexton*, 609 N.W.2d 822, 825 (Mich. 2000) ("[I]f resolution of a disputed factual question turns on the credibility of witnesses or the weight of the evidence, we will defer to the trial court, which had a superior opportunity to evaluate these matters.").

Although the district court asserted that the Michigan courts had engaged in "an unreasonable determination of the facts," it did not cite the requisite clear and convincing evidence contrary to that relied on by the Michigan courts. Rather, it conclusively asserted that "[t]he record supports a factual finding that Petitioner did invoke his right with [O]fficer Simon and later with Fisher," noting only that McPherson testified that he had "repeatedly requested" to speak with an attorney and that Simon and Fisher never denied that McPherson asked to speak with an attorney. In essence, the district court disagreed with the state trial court's credibility assessments. But this is exactly the type of re-weighing of evidence that is foreclosed under AEDPA, and we must therefore reverse the district court's grant of *habeas* on this ground.

## C.

McPherson argues in his cross-appeal that he is entitled to *habeas* relief because the prosecutor introduced a statement by Cherell King, in which Cherell King implicated McPherson in the shooting. McPherson argues that the Michigan Court of Appeals

unreasonably applied the Sixth Amendment, as explained in *Crawford v. Washington*, 541

U.S. 36 (2004). The statement was "introduced" as follows:

> Q: And isn't that what, actually, happened here, that Mr. [Cherell] King has ratted, using the term from term of art, ratted you out?
>
> A: No, sir.
>
> Q: And you had known that before you gave your statement to Investigator Fisher on November twenty-fourth at 3:30 in the afternoon on that day, you already knew that Mr. [Cherell] King had ratted you out, isn't that true?
>
> A: He ended up telling me that he said that I did it.

Contrary to McPherson's assertion, introduction of this evidence does not constitute

an unreasonable application of *Crawford*. *Crawford* precludes the use of testimonial out-of-

court statements unless the witness is unavailable and the defendant had a prior opportunity

for cross-examination. 541 U.S. at 68. Although admission of testimonial hearsay violates

the Confrontation Clause, testimonial statements may be admitted "for purposes other than

establishing the truth of the matter asserted." *Id.* at 59 n.9 (internal citation omitted). Here,

the prosecutor did not introduce the statement itself, but asked only about McPherson's

awareness that Cherell King had made a statement implicating him in order to establish his

mindset at the time of his own statement. This purpose was confirmed when the trial court

limited the prosecutor's further questioning to "what Investigator Fisher told the Defendant,

as to why he made the statement that he made." As noted by the Michigan Court of Appeals,

"the prosecutor's question was designed to impeach defendant's statement that [Cherell] King

was the shooter." Because the Michigan Court of Appeals did not unreasonably apply federal law, we affirm the district court's denial of *habeas* on this ground.

**D.**

McPherson next argues that the Michigan Court of Appeals unreasonably applied federal law by affirming the trial court's limitation on McPherson's counsel's cross-examination of Montez Meadows. The Michigan Court of Appeals correctly reasoned that McPherson did not properly preserve his claim because he did not demonstrate "what relevant evidence he was unable to present or what issues he was unable to adequately explore because of the trial court's limitation."

Montez Meadows, an eyewitness, testified at McPherson's second trial that she encountered Abdul Scott and Max King near where the shooting occurred. She testified that McPherson and another man got out of the car and shot at Scott and King. However, when Meadows had testified at McPherson's first trial, she said that she did not know and could not identify the two men who got out of the car. To explain the contradiction in her testimony, Meadows testified that she had been scared at the first trial but decided that it had been "wrong" not to tell all that she knew.

The trial court put reasonable limits on Meadows's cross-examination, in light of defense counsel's repetitive questioning and Meadows's increasing distress. The trial court noted that Meadows had become distraught on the witness stand, causing the trial court to

recess the proceedings early for lunch. Before taking its break, the court instructed the witness that she must "regain [her] composure" and notified the lawyers that they would have ten more minutes of cross-examination, ten minutes on redirect, and five minutes of re-cross. McPherson's trial counsel, Corbett O'Meara, indicated that the time constraints "will be substantially limiting the interrogation that [he] intended, and [] would otherwise pursue." However, on the record, the trial court noted that O'Meara had spent "fifty minutes" exploring why Meadows did not previously tell investigators that she knew who had committed the shooting. The trial court noted that "this witness is distraught, this witness is close to being, in this Court's estimation, close to a breakdown."

The Confrontation Clause does not provide an unbounded right to cross-examination. As noted by the Supreme Court, it guarantees only "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). The proper analysis in determining whether counsel was granted an opportunity for effective cross-examination asks whether the jury had enough information to assess the defense theory, in spite of any court-imposed limitations. *Dorsey v. Parke*, 872 F.2d 163, 167 (6th Cir. 1989). Here, McPherson was given adequate opportunity to explore Meadows's conflicting statements, her credibility, and her observations on the day of the shooting. In fact, McPherson does not adequately articulate how his rights have been affected in his brief to *this* court, noting only that he was precluded "from bringing to the attention of the jury defects in [Meadows's]

character affecting truthfulness and of her background necessary for the jury to properly assess her testimony in light of the defense theory." Lacking any indication that the Michigan Court of Appeals unreasonably applied federal law on this issue, we affirm the district court's denial of *habeas* on this ground.

## E.

McPherson also asserts that he is entitled to *habeas* relief on the basis of prosecutorial misconduct. He argues that the prosecutor's statement, during closing argument, that "part of the information the police has has been buried with the man who got shot in the back of the head and got dumped in Hamtramck" was not supported by evidence, that the prosecutor improperly used Cherell King's out-of-court statement, vouched for Meadows's credibility, and tried to convince the jury that McPherson was a dangerous person of bad character. However, on *habeas* review, McPherson must demonstrate that the prosecutor's remarks rendered the conviction resulting from the trial a denial of due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). This he has not done.

In analyzing whether a prosecutor's comments created a fundamentally unfair trial, we look to "(1) whether the evidence against the defendant was strong[;] (2) whether the conduct of the prosecution tended to mislead the jury or prejudice the defendant; (3) whether the conduct or remarks were isolated or extensive; and (4) whether the remarks were made deliberately or accidentally." *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (internal citation omitted). Although the prosecutor made some regrettable comments during the

course of the trial, McPherson has not shown that the comments denied him a fair trial in light

of the strength of the evidence against him and the isolated nature of the comments. *See id.*

Further, the trial court's jury instruction that "[t]he lawyers' statements or arguments, they are

not evidence" was sufficient to render any error harmless, and the district court properly

denied *habeas* on this issue. *See United States v. Crosgrove*, 637 F.3d 646, 664 (6th Cir.

2011).

**F.**

McPherson claims that he was denied a fair trial by Sims's "unresponsive" testimony

on cross-examination. The testimony at issue was as follows:

> A: . . . I've interviewed over 2,500 people. If they have not done anything, no
> matter what you present to them, they're going to tell you, I didn't do it, I'm
> telling you I didn't do it, I'm telling the truth. Only a person that did, may
> have committed the crime, or committed the crime is going to say that I did it,
> but it was excused or logic or philosophical reason why.
>
> Q: Only a person who's committed the crime is going to say they committed
> the act, but they have an excuse?
>
> A: Yes.

The Michigan Court of Appeals denied relief on this claim on the basis of the invited error

doctrine, observing that McPherson's trial counsel assumed the possibility that Sims could

provide an opinion harmful to his client when he questioned Sims about interview techniques.

As noted by the district court, in light of the fact that Sims's remark was made in response to

a question from defense counsel and was limited, McPherson has failed to demonstrate that

he was deprived of a fair trial by the statement and he is not entitled to *habeas* relief on this

ground.

**G.**

McPherson alleges that he received ineffective assistance of trial counsel by counsel's

failure to articulate his objection to the limitations placed on cross-examination of Meadows,

by his open-ended questioning that permitted Sims's unresponsive testimony, and by failing

to object to the prosecutor's statements noted above.

For McPherson to be entitled to relief on his ineffective assistance claim, he would

have to demonstrate both that his counsel provided deficient performance and that he suffered

resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Deficient

performance occurs if "counsel's representation fell below an objective standard of

reasonableness." *Id.* at 688. We apply a "strong presumption" that counsel's performance

was reasonable, *id.* at 689, and a petitioner seeking to prove deficient performance must

demonstrate that counsel's errors were so egregious that he "was not functioning as the

'counsel' guaranteed the defendant by the Sixth Amendment," *id.* at 687. In order to

demonstrate prejudice, a petitioner must present "a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different. A

reasonable probability is a probability sufficient to undermine confidence in the outcome."

*Id.* at 694. A "conceivable effect on the outcome of the proceeding" is insufficient. *Id.* at

693. Rather, a petition must show errors "so serious as to deprive the defendant of a fair

trial." *Id.* at 687. When ineffective assistance claims are reviewed under AEDPA deference, and these two exacting standards apply simultaneously, review is "doubly" deferential, and the appropriate question for review is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 131 S. Ct. at 788 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

Applying that "doubly deferential" standard to McPherson's case, McPherson cannot show that the Michigan Supreme Court had "no reasonable basis" for its determination that *Strickland*'s deferential standard could not be met. *See Richter*, 131 S. Ct. at 784. McPherson argues that trial counsel provided ineffective assistance for failing to properly object to the limitation of cross-examination of Meadows and for questioning Sims in a manner that allowed him to give unresponsive testimony. McPherson has not articulated in this court how he was prejudiced by the trial court's limitation on his cross-examination of Meadows. We have already held that McPherson was not prejudiced by Sims's unresponsive testimony or by the prosecutor's statements. Without this showing of prejudice, McPherson's ineffective assistance claims fail.

**III.**

For the foregoing reasons, we reverse the district court's grant of *habeas corpus* on McPherson's Fifth Amendment ground and affirm the district court's denial of *habeas corpus* on all other grounds.