RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0073p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

> *Plaintiff-Appellee*,

*v.*

ADAM DEAN FOX (23-1014); BARRY GORDON CROFT, JR., (23-1029),

> *Defendants-Appellants*.

Nos. 23-1014/1029

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:20-cr-00183—Robert J. Jonker, District Judge.

Argued: May 2, 2024

Decided and Filed: April 1, 2025

Before: LARSEN, READLER, and DAVIS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Steven S. Nolder, Columbus, Ohio, for Appellant in 23-1014. Timothy F. Sweeney, LAW OFFICE OF TIMOTHY F. SWEENEY, Cleveland, Ohio, for Appellant in 23-1029. Nils R. Kessler, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Steven S. Nolder, Columbus, Ohio, for Appellant in 23-1014. Timothy F. Sweeney, LAW OFFICE OF TIMOTHY F. SWEENEY, Cleveland, Ohio, for Appellant in 23-1029. Nils R. Kessler, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

---

**OPINION**

---

PER CURIAM.  During the summer of 2020, Adam Fox and Barry Croft, Jr. hatched an elaborate plan to kidnap Michigan's Governor, Gretchen Whitmer.  A federal jury convicted both men on all charges, and the district court sentenced Fox to 192 months' imprisonment and Croft to 235 months' imprisonment.  On appeal, Defendants argue that there was insufficient evidence to convict them of the charges and that the district court erred by: (1) declining to conduct a "*Remmer*" hearing to allow questioning of an allegedly biased juror, pursuant to *Remmer v. United States*, 347 U.S. 227 (1954); (2) limiting the defense's time for cross-examination of a co-conspirator; and (3) limiting the scope of the admissibility of certain government informant statements.  For the reasons set forth below, we affirm.

**I.**

**A.**

Beginning in March 2020, the Federal Bureau of Investigation ("FBI") received a tip from Dan Chappel, a member of a Michigan-based militia group known as the Wolverine Watchmen.  Chappel had become concerned about the group's shift in discussions from honing their firearms skills to killing local law enforcement officers.  After talks with the FBI, Chappel agreed to become an informant and to gather information on the Wolverine Watchmen's activities

During this same time, the FBI was also investigating a Delaware resident, Barry Croft, Jr., relating to his communications with a federal fugitive and his posting of threats to kill FBI agents on his social media accounts.  According to later witness testimony, Croft had been associated with anti-government extremist views for some time.  In October 2019, Croft sent a direct message through Facebook to a friend explaining that he was planning a "flash gathering in Ohio," with the goal of evading FBI detection.  (R. 838, PageID 14491–92).  In a recording, Croft mentioned that since December 2019, he had been speaking about abducting a state

governor, explaining that he wanted to "take the militia and go grab that f[]cking governor right where he lives at." (Gov. Ex. 112).

In February 2020, Croft befriended Michigan resident, Adam Fox, on Facebook, and the two exchanged contact information while continuing to correspond during the spring of 2020. At some point, Croft contacted Fox and invited him to a gathering in Ohio. Fox agreed to attend, and, during the conversation, he explained that he was "ready [to] get something done" and that it was "time to inspire and move people," noting that he was going to be a "Savage on that Battle field [sic]." (Gov. Ex. 479-002). Croft responded that he had some "good ideas that require the gift of physical." (*Id.*)

In April 2020, Croft posted online that the execution of state governors would lead to a second American Revolution and that "all it's going to take is 1 state, to burn out and hang a Gove[r]nor, and those dominoes will start falling." (Gov. Ex. 4). In May 2020, Croft posted a picture of a noose, accompanied by text stating: "Which Governor is going to end up dragged off, and hung for treason first?" (Gov. Ex. 360). In advance of a planned meeting in Ohio, Croft told Fox that the meeting was to discuss "improvis[at]ions" (sic) for attack plans, stating "that's what this weekend is about, man, take it back to your units, back to the men of your area, discuss what's been disseminated, and then let's go get some." (Gov. Ex. 486)

*Meeting in Dublin, Ohio.* On June 6, 2020, various militia groups convened in Dublin, Ohio. Croft and Fox met in person for the first time. Prior to the meeting, the FBI had learned that Steve Robeson—a government informant—was invited, so they provided him with a recording device to monitor the meeting's activities. During the meeting, Croft stated that he planned to "terrorize people. The right people." (Gov. Ex. 35). He also explained that he had studied insurgency tactics and instructed attendees on how to make explosive devices. Fox proposed "storm[ing] the Capitol" and advocated for taking government officials as hostages. (Gov. Ex. 40).

*Croft's Recruitment of Fox.* A week after the Dublin, Ohio, meeting, Croft began working to connect Fox with his contacts in the Wolverine Watchmen. In a Facebook message to Watchmen leader Pete Musico, Croft explained that Fox was working with the 2nd

Continental, Michigan Regiment.  That same day, Croft also contacted Fox to notify him that he would be connecting him with his Michigan contacts.  Fox then messaged Musico's son-in-law and Watchmen co-leader, Joe Morrison, and discussed the fact that they had a common goal and that they should meet and talk.  That same week, Fox left a voice message for another associate:

> I wanna make real change, dude.  I don't want no more of these fake-[]ss f[]cking rallies that don't do nothing.  Like, I wanna go make actual change.  I wanna set this sh[]t up.  I want to bring formal charges against our governor, and the tyrants in our f[]cking state.  And I want to go f[]cking charge them.  And arrest them.  And f[]cking make them accountable.  For once in our f[]cking lives, let's do something f[]cking bold.

(R. 838, PageID 14538; Gov. Ex. 54).

On June 18, 2020, Fox met members of the Wolverine Watchmen at a rally outside the Michigan State Capitol.  This was Fox's first meeting with government informant Chappel.  Fox was also introduced to FBI Special Agent Mark Schweers, who posed as someone who shared Fox's ideals.  Fox invited Schweers and members of the Watchmen, including Chappel and Ty Garbin, to a meeting at the Vac Shack, a local business in Grand Rapids, Michigan, where Fox lived and worked.

*Vac Shack Meeting in Grand Rapids, Michigan.*  On June 20, 2020, Fox held a meeting at the Vac Shack where Fox required attendees to surrender their cell phones before entering a trap door to the basement.  Fox proffered ideas that included storming the Michigan Capitol and executing Governor Gretchen Whitmer.  For instance, in a conversation recorded by Chappel, Fox stated: "I don't feel like we should be waiting until November . . . I think we need to actively be staging and planning things." (Gov. Ex. 64).  Fox also told the attendees about the Ohio meeting, explaining that there were numerous strategies.  While admitting that some of the ideas were "pretty farfetched and extreme," he also noted that there were other options to "level [the] tactical playing field."  (Gov. Ex. 65).  Fox also discussed soliciting an explosives specialist, Matt Keepers, and notified the group that he had a meeting with Keepers the following Monday.

Days later, Fox reached out to recruit Keepers, whom Fox had known since 2017–2018 through their membership in a different militia group.  In a Facebook message, Fox explained to

Keepers that the group had come together to "tak[e] action" and stressed the need to "keep things secure," meaning maintain secrecy when discussing their plans. (Gov. Ex. 444). Keepers testified that almost three months after the initial exchange, Fox asked him for help to procure explosives. Keepers declined and ended the conversation.

*FTX in Munith, Michigan.* On June 28, 2020, Fox attended a Wolverine Watchmen field training exercise ("FTX") in Munith, Michigan. There, he told attendees that they needed to arrest Governor Whitmer for treason against the citizens of Michigan, and that she should be hanged. The next day, Croft contacted an associate and echoed Fox's message, explaining that "Michigan's government is a target of opportunity" and "[i]f an opportunity presents we'll engage . . . God knows the governor needs hung." (R. 838, PageID 14543–44; Gov. Ex. 71).

*FTX in Cambria, Wisconsin.* During the weekend of July 10–12, 2020, Fox and members of the Wolverine Watchmen traveled to Cambria, Wisconsin, to participate in another FTX. Croft, who had not attended the Munith FTX, was also present. On the first day, the group met at a local restaurant where Croft said he did not like the idea of anyone being killed, but assured the group that "you don't make an omelet without breaking a few eggs . . . So, unfortunately, bad decisions have put us in a place where eggs are going to have to get broken." (Gov. Ex. 93). Croft also conveyed that if he had the opportunity to take Governor Whitmer into custody and hold a trial, he could "hold her accountable for her actions [and] have her adjudged," while noting that "treason is a hanging offense." (Gov. Ex. 106).

Over the weekend, Croft and others built a "shoot house," where they practiced breaching and shooting a room with semiautomatic rifles and live ammunition. (R. 841, PageID 15089–91; R. 842, PageID 15510). They also conducted medical training to simulate treating wounds suffered in the event of combat. On the final day of the FTX, Croft explained his tactical plan to an informant:

> Now, here's the thing. If I can plan an operation where I can rain down on an empty f[]cking field of police cars, inhibiting their travel, okay? And then simultaneously plan an operation across town where I drop a communications tower. And all the while have a team standing by to grab a f[]cking governor. While all that commotion is going on, while all that, their f[]cking communications what they have left after blowing the tower, is lighting up.

'Oh my god, there's artillery raining down on this precinct. This tower just dropped over here on this f[]cking municipal airport runway.'

---

And while it's all in the midst of confusion, there's a tornado spinning through your f[]cking community, wham! A quick, precise grab on that f[]cking governor. And all you're going to f[]cking end up having to possibly take out is her armed guard. Whitmer. Whitmer. Michigan. Whitmer. Her armed guard. All I'm going to have to possibly neutralize.

---

[I]f that precise group of seven men are prepared for the job? I've put three of them as snipers with FLEERs, so their (sic) f[]cking shooting at heat signatures, dropping those f[]cking armed guards before we even broach the f[]cking house. All that's left leaving is her, you understand?

(R. 839, PageID 14742; Gov. Ex. 108).

Croft also took into consideration that Governor Whitmer's security detail would be "armored targets," and concluded as a result that making improvised explosive devices ("IEDs") was imperative to "have a chance against" them. (*Id.* at 14737; Exs. 84, 85). For this purpose, he noted that he would need to train the group in the use of demolitions. Accordingly, Croft took a red duffel bag filled with materials to craft IEDs to the Cambria FTX with the purpose of using them against both humans and vehicles. Croft, Garbin, and fellow Wolverine Watchman Kaleb Franks, tried to build an IED using a funnel, gunpowder, and copper BBs[1] for shrapnel at this FTX, but their efforts ultimately failed.

*First Reconnaissance of Governor Whitmer's Home.* Over a week after the Cambria FTX, at a meeting in Peebles, Ohio, Fox told an informant of several different ideas. One was to kidnap the Governor from her vacation home near Traverse City, Michigan in a "one [night] execution," after first spending two weeks performing reconnaissance and another week planning. On July 27, Fox shared these plans with informant Chappel.

---

[1]A "BB" is "a shot pellet 0.175 inch in diameter for use in a BB gun." *BB*, Merriam-Webster's Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/BB (last visited June 27, 2024); *see also BB Gun*, Merriam-Webster's Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/BB%20gun (last visited June 27, 2024) ("a smooth-bore air gun actuated by a spring-loaded plunger that upon release from the cocked position compresses the air behind the pellet and propels it from the tube.").

On August 29, Fox, Chappel, and Wolverine Watchman Daniel Molitor, went to surveil the Governor's home. Upon arrival, Fox took photographs of the cottage and instructed Chappel to drive past it several times for Molitor to make a slow-motion video. On the opposite side of the lake, the group searched for an alternate way to approach the Governor's home by boat. Looking across the lake, Fox noticed a boat launch and came up with the idea to travel to her home, launch a boat and leave a trailer in the water, kidnap the Governor, then hook the boat to the trailer and escape. He added that this was the "perfect" plan as the Coast Guard would not be there to interfere. (R. 841, PageID 15133; Gov. Ex. 197). At the same time, Fox noted that the group needed to focus on interference by the local police. The group then drove to the local police department and noted its location.

After the reconnaissance, Fox, Chappel, and Molitor went to eat at a local diner where Fox took a piece of paper and drew a map of the Governor's home and the surrounding areas. This included the name of the street, the water route to her home from across the lake, and the distance of the closest police station, in miles and minutes, from the home.

*FTX in Luther, Michigan*. On September 4, Fox messaged Chappel telling him to add certain equipment to the list of kidnapping materials, including flash bangs, a hood for the "asset," and flex cuffs. (R. 841, PageID 15141–43; Gov. Ex. 208). Garbin testified that the "asset" for whom the hood was required, was in fact Governor Whitmer. In preparation for the upcoming FTX in Luther, Michigan, Garbin and Kaleb Franks began constructing the training camp, which included a backdrop for live fire exercises with human silhouette targets. They also constructed another shoot house, which, according to Fox, was to simulate the inside of Governor Whitmer's vacation home.

During the weekend of September 11–13, 2020, the group met in Luther for the FTX. Video recordings from the training exercises depict members of the group practicing breaching the home, with Croft using a specially modified shotgun to assist with breaking open locked doors, while donning a camouflage uniform with a flag patch associated with revolutionary-oriented militia groups. Croft later told an informant that he was building a bomb with pennies attached as "metal projectile[s]" with a sizable blast radius. (Gov. Ex. 219). He added that the pennies were going to be hot when they exploded and could penetrate the skin. Concerned about

Croft's previous discussion about recruiting an explosives specialist in June 2020, the FBI directed Chappel to introduce Fox to undercover agent Timothy Bates, who went by the alias of "Red," an old Army friend with access to explosives. Bates attended the Luther FTX and told Fox and Croft that he had a video demonstrating the power of C-4 explosives.

*Second Reconnaissance of Governor Whitmer's Home.* On the evening of September 12, 2020, Fox gathered group members to perform a nighttime reconnaissance of Governor Whitmer's home. Before heading out, Fox detailed his plan to kidnap the Governor, including the need for explosives to blow up the bridge (the only one leading out of the city). He invited others, including undercover agent Schweers, to watch Bates's video of the explosive demonstrations. Fox advised that the plan now included taking the Governor out to Lake Michigan, dropping the motor from the boat, and leaving her stranded. While explaining that the new goal was not to kill anyone, Fox mentioned that "it's going to send a [] message . . . 'Hey. If we can get her, we can get you.'" (Gov. Ex. 223). After Fox and Croft viewed the video of explosives, Fox inquired about the price, and Bates replied that it would be $5,000.

The group changed out of military clothing and departed for Governor Whitmer's residence in three vehicles to begin surveillance. The first car, containing Fox, Croft, Chappel, Bates, and another informant, went to the Governor's vacation home to surveil it in preparation for the kidnapping. While en route, they stopped at the bridge where both Fox and Bates got out of the vehicle to take pictures underneath it, while discussing where to place the explosives. Next, the group drove to the boat launch to view it with a night vision scope. The second car, containing Garbin, Franks, and another member of the group, Brian Higgins, drove to the Governor's street on the other side of the lake, using night vision goggles to view the first vehicle's infrared flashlight to signal to the others once they arrived in position. The third car, containing Wolverine Watchmen William and Michael Null, was assigned to drive around the area and keep watch for law enforcement.

*Abduction Plan & Ordering of Explosives.* The next morning, on September 13, 2020, the group gathered at Garbin's camp in Luther, Michigan, to discuss the surveillance of the prior evening. Croft determined that the best plan would be to transport the Governor from Birch Lake (the location of her residence) to Lake Michigan. Fox agreed. Later in the day, Croft, Fox,

Garbin, Franks, Chappel, Bates, and others discussed the possibility that Governor Whitmer would have a U.S. Secret Service detail if she were appointed to a cabinet position after the 2020 presidential election. Croft explained that in the event that she had increased security, the group would need a grenade launcher to engage her detail. When asked about the possibility of being caught, Croft responded: "That's something you need to think about, then. If we're going to carry out an operation of this magnitude, you are going to have to walk away from life." (Gov. Ex. 257). Fox and Bates eventually agreed to $4,000 for the explosives and $600 for the flash bangs; Fox notified the group that they would have to pitch-in regarding the $4,000 for the purchase.

*IED Detonation.* On September 13, 2020, during the final day of the Luther FTX, Croft detonated an IED that he said was made from a mortar firework and pennies for shrapnel. Croft's girlfriend, Chasity Knight, later testified that before the explosion, Croft went up the hill to detonate the explosive, and then she heard "a big boom." (R. 841, PageID 15184). A recording by an informant captured a voice yelling, "Fire in the hole!" followed by the explosion. (Gov. Ex. 222).

*Final Vac Shack Training.* On September 19, 2020, in an encrypted chat message, Fox proposed running an extraction drill in the basement of the Vac Shack, which included close quarters combat training. Fox emphasized that the group only had six weeks until the 2020 presidential election, so it was imperative to use the time wisely to prepare. On September 30, Fox called Chappel to notify him that he was getting the basement prepared for the drills. Preparations included creating dark rooms to practice using night vision, and practicing using handcuffs to "obtain[] the [Governor] and extract[] [her] out." (R. 841, PageID 15168; Gov. Ex. 278). During his call with Chappel, Fox also discussed using tasers and stun guns on the Governor's security detail and stated that everyone agreed to purchase explosives from Bates.

*Arrests of Co-Conspirators.* At the direction of the FBI, Chappel told Fox the group could meet "Red" (i.e., Bates) in Ypsilanti, Michigan, to make a downpayment on the explosives. On October 7, 2020, when Fox, Garbin, and Franks traveled to the meeting, they were arrested by federal agents. Agents searched Fox's person and seized his cell phone, his stun gun, and $276.17 in cash. According to Garbin, while in jail, Fox admitted that the cash

seized was a good-faith payment for the explosives and that he had an additional $600 at his home.

Agents searched the Vac Shack and seized the aforementioned $600, a Taurus 9mm semiautomatic pistol, a loaded Palmetto 5.56mm semiautomatic rifle, a vest carrier for body armor plates with an attached radio, loaded rifle magazines, a medical kit, a tactical helmet, and smoke cannisters. Agents also retrieved a backpack containing duct tape, a knife, rope, zip ties, and flex cuffs. Included among the items seized were Fox's handwritten notes, which contained references to the plans and the equipment that would be needed to carry them out. On the cell phone seized from Fox's person, agents found maps of the Birch Lake area, including a zoomed-in view of the Governor's street.

The following day, Croft was arrested on a highway in New Jersey. Agents recovered, among other things, a loaded Glock 10mm semiautomatic pistol with an extended magazine. And a search of Croft's home netted a red duffel bag containing hobby fuse, two cannisters of smokeless powder, three cannisters of smokeless propellant, one exploding target, a jar containing 6,000 copper-coated steel BBs, duct tape, electrical tape, a funnel, travel-sized silicon containers, and party balloons. Agents also recovered Croft's double-barreled 12-guage breaching shotgun, commercial fireworks, and the receipt for Croft's purchase of the fireworks, along with $353 in cash. A separate team searched the camp at the Luther FTX site and found a mortar for firing the same type of fireworks found at Croft's home. In the forest near the camp, agents discovered a burned area with scattered metal objects, staples, and charred pennies.

**B.**

On April 28, 2021, a federal grand jury in the United States District Court for the Western District of Michigan returned a superseding indictment against Fox, Croft, Franks, Daniel Harris, and Brandon Caserta. Count 1 charged all five defendants with conspiracy to kidnap Governor Whitmer in violation of 18 U.S.C. § 1201(c). Count 2 charged Fox, Croft, and Harris with conspiracy to use a weapon of mass destruction ("WMD") in violation of 18 U.S.C. §§ 2332a(a)(2)(A), (C) and 921(a)(4). Count 3 charged Croft and Harris with possession of an unregistered destructive device in violation of 26 U.S.C. §§ 5861(d), 5871, and 5841. Count 4

charged Harris with possession of an unregistered short-barreled rifle in violation of 26 U.S.C. § 5861(d).

Franks pleaded guilty in February 2022.  The remaining defendants went to trial in March 2022.  After a 20-day trial, Harris and Caserta were acquitted, while the jury was unable to reach a verdict on Fox and Croft.  They were retried in August 2022, and the jury found both men guilty of all charges.  Fox was sentenced to 192 months' imprisonment and Croft was sentenced to 235 months' imprisonment.  Defendants timely appealed.

**II.**

Defendants raise the following claims: (1) there was insufficient evidence to convict them of the conspiracy charges and the possession of an unregistered destructive device (Croft only); (2) the district court abused its discretion in declining to hold a *Remmer* hearing for defense counsel to question an allegedly biased juror; (3) the district court abused its discretion when it "arbitrarily" placed time limits on the defense's cross-examination of co-conspirator, Kaleb Franks; and (4) the district court abused its discretion when it limited the admission of informant statements to those that repeated the words of the federal agents.  We address each argument in turn.

**A.**

*Sufficiency of the Evidence*.  We review challenges to the sufficiency of evidence for a conviction de novo.  *United States v. Bauer*, 82 F.4th 522, 528 (6th Cir. 2023).  In doing so, we must "draw all reasonable inferences, including inferences from circumstantial evidence, in favor of the government."  *United States v. Acosta*, 924 F.3d 288, 296–97 (6th Cir. 2019).  "A conviction is based on sufficient evidence if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *United States v. Matthews*, 31 F.4th 436, 446 (6th Cir. 2022) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  We will not reverse a conviction based on a sufficiency of the evidence claim unless, "viewing the record as a whole, the judgment is not supported by substantial and competent evidence."  *United States v. Wright*, 774 F.3d 1085, 1088 (6th Cir. 2014) (quoting *United States v. Blakeney*, 942 F.2d 1001, 1010 (6th

Cir. 1991)).  The "heavy burden" to show that the evidence was not substantial or competent lies with the defendant.  *Wright*, 774 F.3d at 1088 (citation omitted).

Here, both Fox and Croft maintain that the government failed to meet its burden of proof on Counts 1 (conspiracy to kidnap) and 2 (conspiracy to use a WMD) of the superseding indictment.  While Croft, alone, challenges the sufficiency of the evidence for Count 3 (possession of an unregistered destructive device).

**1.**

*Conspiracy to Kidnap*.  "To prove a conspiracy to kidnap under [18 U.S.C.] § 1201(c), the government must show:  '(1) the existence of an agreement to violate the law; (2) knowledge and intent to join the conspiracy; and (3) an overt act constituting actual participation in the conspiracy.'"  *United States v. Small*, 988 F.3d 241, 252 (6th Cir. 2021) (quoting *United States v. Blackwell*, 459 F.3d 739, 760 (6th Cir. 2006)).  Because a conspiracy "may be inferred from circumstantial evidence, a defendant's knowledge of and participation in a conspiracy also may be inferred from his conduct and established by circumstantial evidence."  *Id.* (quoting *United States v. Conatser*, 514 F.3d 508, 518 (6th Cir. 2008)).

Fox maintains that the government failed to prove that he agreed to kidnap Governor Whitmer because there was "no specific plan," and the plans he discussed were "fanciful" and "fantastic."  (ECF 26, Fox Appellant Br. 55–56).  An agreement to join a conspiracy "can be tacit, not formal."  *United States v. Williams*, 998 F.3d 716, 728 (6th Cir. 2021) (internal quotations omitted).  So the government was not required to present evidence of an express arrangement.  It merely had to show that Defendants "agreed to participate in what [they] knew to be a collective venture directed toward a common goal."  *United States v. Smith*, 320 F.3d 647, 653 (6th Cir. 2003).

Our decision in *United States v. Amawi*, 695 F.3d 457 (6th Cir. 2012), is instructive.  *Amawi* involved a group of men charged with conspiring to kill U.S. military personnel stationed in Iraq.  *Id.* at 475–76.  The defendants in that case had not formally expressed their assent, but their actions were enough to show their agreement.  Amawi directly told a second individual that "he wanted to go to perform Jihad against the U.S. troops overseas," meaning that he wanted to

kill them. *Id.* at 476. He subsequently provided the second individual with jihadist videos used to train terrorists and recruited a third individual to train with him and the second individual for the mission. *Id.* at 466. Thus, all three viewed videos that depicted "martyrdom" operations and met to discuss various plans. *Id.* at 477–78. Their discussions included "join[ing] the brothers overseas" in reference to gathering with other militant groups fighting against the U.S. military, and conducting trainings aimed at meeting their goals. *Id.* at 477.

The *Amawi* defendants argued that the government's evidence was insufficient to show that they agreed to commit the same crime. *Id.* at 476–77. In upholding the defendants' convictions there, we noted that "[t]the distinguishing feature of a conspiracy is the agreement to violate the law." *Id.* at 476 (citing *Iannelli v. United States*, 420 U.S. 770, 777 (1975)). So framed, we observed that the government needed to prove only that the defendants adopted the "conspiracy's main objective." *Id.* (citing *United States v. Crossley*, 224 F.3d 847, 856 (6th Cir. 2000)). Thus, we concluded that the groups' meeting alone—where none of the co-conspirators dissented from the objectives discussed—was sufficient to demonstrate a "collective venture" for purposes of providing sufficient evidence of an agreement to join a single conspiracy. *Id.* at 477.

The record before us is replete with evidence that Fox and Croft agreed to kidnap Governor Whitmer from her lakeside home provided the right opportunity presented itself. Like *Amawi*, Fox explicitly stated his intention to kidnap the governor to Croft and others. And similar to the defendants in *Amawi*, Fox and Croft's agreement formed as they discussed plans to carry out the venture. But the planning did not stop there. The evidence of an agreement extended well-beyond a single meeting and training. *See id.* at 477. Defendants conducted multiple reconnaissance operations near Governor Whitmer's home. From their observations during reconnaissance, Fox hatched what he called the "perfect" plan, which involved launching a boat or two, leaving a trailer in the water, disabling the governor's security detail to take her into their custody, taking her out into Lake Michigan and dropping the boat's motor, returning in the second boat to the waiting trailer, and escaping. To solidify the plan, Fox drafted a detailed map of the governor's street, the water route to her home from across the lake, and the distance of the police station—in miles and minutes—from the home.

Moreover, in addition to gathering the group for a second reconnaissance of the governor's home on the evening of September 12, 2020, Fox also explicitly agreed with Croft's plan to kidnap the governor from Birch Lake and transport her to Lake Michigan, stating: "That's what I'm saying. She has to be out of the lake. Birch Lake[,]" while noting that there was easy access to Lake Michigan. (Gov. Ex. 251). Considering the multiple meetings, reconnaissance missions, fine-tuning of plans on how to obtain physical custody of the governor, and arrangements to purchase explosives to assist with the get-away, a rational juror could find that Fox's ideas were not merely "fanciful" and "fantastic" musings, but instead were sufficient to demonstrate a specific and common goal to kidnap Governor Whitmer. Further, his participation at these meetings, trainings, and reconnaissance missions, during which he never once registered any objection to the stated goal, is sufficient circumstantial evidence that he agreed with others to carry it out.

Fox also argues that there was no agreement because there were no specifics as to timing; namely, "when the mission was to occur." (ECF 26, Fox Appellant Br. 57). This argument is unavailing. A lack of a specific day and time does not defeat the existence of a conspiratorial agreement; the focus is on whether there was a meeting of the minds for a criminal purpose. *See Williamson v. United States*, 207 U.S. 425, 449 (1908) ("It was not essential to the commission of the crime that in the minds of the conspirators the precise persons to be suborned, or the time and place of such suborning, should have been agreed upon, . . . as the criminality of the conspiracy charged consisted in the unlawful agreement to compass a criminal purpose."); *see also Amawi*, 695 F.3d at 476 (explaining that knowledge of "every detail" is not required; "the government must prove that each defendant adopted the conspiracy's main objective."). In any event, Fox specified that the kidnapping mission was to occur before the 2020 presidential election out of concern that Governor Whitmer might receive a cabinet position appointment after the election, in which case they would face a heightened level of security. On September 13, 2020, and again on September 19, 2020, Fox emphasized this point, stating: "Well we need all the reps we can get, have 6 weeks til election and one week is ftx so let's utilize these 5 weekend[s] best we can." (Gov. Ex. 443). Hence, there was evidence of an established timeframe for the kidnaping. Fox offers no evidence to suggest otherwise.

Croft's arguments fare no better. First, Croft maintains that he did not enter into an agreement because there was no plan of action on which to agree. As discussed above, a rational juror could find that there was a plan of action. In fact, at the Cambria FTX, Croft fashioned the initial kidnapping plan, which included "tak[ing] out [] her armed guard" and "broach[ing]" the Governor's home. (Gov. Ex. 108). Croft also participated in the second reconnaissance of Governor Whitmer's home to conduct surveillance in preparation for the kidnapping. When he gathered with Fox and others the following morning, Croft not only agreed to, but he also refined the plan—to which Fox and the others agreed—to take Governor Whitmer and transport her from Birch Lake to Lake Michigan. Croft's agreement and commitment to this common goal is perhaps best illustrated by his statement to an informant that in the event something went wrong, the informant would have to be ready to "walk away from life." (Gov. Ex. 257). Moreover, whether every detail had been worked out is not our measure. Again, the government need only prove that Croft adopted the "main objective." *Amawi*, 695 F.3d at 476. His attendance at meetings, trainings, and reconnaissance missions along with his efforts to fine-tune the details of the kidnapping plan show that he did.

Croft also argues that he could not have agreed to join the conspiracy because he was merely present during some of the discussions and was not trusted by his co-conspirators. But this argument is belied by the record. It is true that "[m]ere presence at the crime scene is insufficient" to prove that a defendant had the requisite knowledge and intent to join a conspiracy. *United States v. Christian*, 786 F.2d 203, 211 (6th Cir. 1986) (citing *United States v. Kincade*, 714 F.2d 1064, 1065 (11th Cir. 1983) ("Although mere presence alone is insufficient to support a guilty verdict, presence is a material and probative factor which the jury may consider in reaching its decision.")). Consequently, courts must distinguish between someone who is merely present during a criminal act and someone who is present but also has criminal culpability. As a longstanding principle, "[a]cts that 'may reasonably be interpreted as participation in a common plan' can be used to establish an implicit agreement." *Amawi*, 695 F.3d at 477 (quoting *United States v. Walls*, 293 F.3d 959, 967 (6th Cir. 2002)).

Here, Croft was not merely present during criminal activity. In addition to attending meetings to discuss the kidnap plans, Croft was a primary contributor to them. And he was

physically active in undertaking overt acts toward accomplishing the objectives of the agreement. For instance, on the night of the second reconnaissance, Croft went to "get[] eyes on the bridge" that he planned to bomb. (R. 843, PageID 15714). He also helped locate Governor Whitmer's home and planned the water-derived escape route that the group would take after the kidnapping.

Croft describes his discussions of the plans as his expression of "unconventional" political views, mere "rhetoric," and "hyperbole," which are protected speech under the First Amendment. (ECF 28, Croft Appellant Br. 6, 32, 38–40). Irrespective of any protection such speech may otherwise enjoy under the United States Constitution, "[t]he First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993).

We faced a similar argument in *Amawi*, where the defendant argued that the district court abused its discretion by rejecting a jury instruction stating that the defendant could only be convicted of conspiracy to kill U.S. military personnel if his speech was not protected under the First Amendment. 695 F.3d at 482. For instance, after agreeing to undergo military training to prepare for attacks against military personnel, Amawi stated that the "fight is in the . . . land of the Army" and asked a co-conspirator if he had the "weapons ready," while also offering to fund the operation. *Id.* at 476. And at some point, Amawi also conveyed his interest in IED training. *Id.* Despite his argument that this language was protected under the First Amendment as freedom of speech, freedom of association, and freedom of religion, this court was not convinced. Instead, we upheld the district court's decision not to issue the proposed jury instruction, emphasizing that "although the conspiracy was closely related to, and indeed proved by, many of the defendants' conversations about political and religious matters, the conviction was based on an *agreement to cooperate in the commission [of] a crime*, not simply to talk about it." *Id.* at 482 (emphasis added). And because the crux of a conspiracy involves "[f]orming an agreement to engage in criminal activities," and not "simply talking about religious or political beliefs," his speech related to the crime was not protected by the First Amendment. *Id.* A defendant cannot use the First Amendment as a shield to disguise criminal conduct; statements relevant to a conspiracy may be heard and weighed by a jury provided they are admissible.

As discussed, there is ample evidence in the record to establish Croft's statements as evidence of a conspiracy to kidnap and not simply discussions of "political views," "rhetoric," or "hyperbole." *See id.* at 482. Thus, to the extent that the government relied on Croft's own statements to demonstrate his agreement to join the conspiracy, such speech was not constitutionally protected.

Defendants also maintain that the government failed to demonstrate that they committed overt acts towards the alleged conspiracy. "It is a basic tenet of conspiracy law that an overt act in furtherance of a conspiracy need not be illegal itself." *United States v. Jerkins*, 871 F.2d 598, 602–03 (6th Cir. 1989). And we impose "no requirement that the defendant himself commit the overt act." *United States v. Bradley*, 917 F.3d 493, 505 (6th Cir. 2019). Rather, "[a]ll that must be prove[n] for a conviction is that *one* of the conspirators . . . knowingly committed at least one overt act charged in the indictment . . . [and] that such overt act was knowingly done in furtherance of some object or purpose of the conspiracy as charged." *Id.* (internal quotation marks omitted).

The record shows that both Fox and Croft also committed overt acts in furtherance of the conspiracy. For instance, Fox traveled to and conducted surveillance on Governor Whitmer's lakeside property on two separate occasions, he attended an FTX where he trained in a "shoot house" constructed to simulate the Governor's home, he ordered explosives from an undercover federal agent, he inspected the bridge near the Governor's home with plans to detonate bombs to prevent law enforcement from reaching the area while the group carried out the kidnapping, and he assembled a kidnapping kit comprised of a knife, flex cuffs, duct tape and rope.

Croft, for his part, recruited Fox to form the Michigan Regiment of his Second Continental Army, with the express goal of targeting state governors. Croft also drove from his home in Delaware to Ohio, Wisconsin, and Michigan to recruit, plan, and train, for the kidnapping. Moreover, Croft suggested the use of his grenade launcher against Governor Whitmer's security detail to prevent them from interfering with the plan to kidnap her. Given the evidence that Defendants had both an agreement to kidnap Governor Whitmer and committed numerous overt acts in furtherance of the agreement, their challenges based on the sufficiency of the evidence fail.

Resisting the overwhelming evidence of a conspiracy, Defendants propose additional arguments. They argue that the government was required to affirmatively establish that Governor Whitmer did not consent to being kidnapped and to prove that both he and Croft would "benefit"[2] from kidnapping her. Both arguments are misguided for the same reason. Supreme Court precedent makes clear that the government's burden in a conspiracy case is simply to show that each member of a conspiracy agreed to participate in what he knew to be a collective venture directed toward the commission of a crime. *See Salinas v. United States*, 522 U.S. 52, 65 (1997). The government is not, however, required to prove all the elements of the underlying crime. *See United States v. Phillips*, 872 F.3d 803, 806 (6th Cir. 2017) ("The government need not prove the elements of fraud to convict Phillips of *conspiracy*. 'It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues.'" (quoting *Salinas*, 522 U.S. at 65)). This is because the essence of a conspiracy is that there must be "an agreement to commit an unlawful act," and as the Court explained, this agreement is "'a *distinct* evil,' which 'may exist and be punished whether or not the substantive crime ensues.'" *United States v. Jimenez Recio*, 537 U.S. 270, 274–75 (2003) (emphasis added) (first quoting *Iannelli*, 420 U.S. at 777; and then quoting *Salinas*, 522 U.S. at 65). Because there is no requirement that the government prove the underlying crime of kidnapping, these arguments fail as a matter of law.

Based on the record, a rational jury could infer that Defendants agreed to kidnap Governor Whitmer from her home and transport her to Lake Michigan and engaged in numerous overt acts in furtherance of the agreement, amounting to a textbook conspiracy.

## 2.

*Conspiracy to Use a Weapon of Mass Destruction*. Under 18 U.S.C. § 2332a(a)(2), it is illegal for a person to, "without lawful authority, use[], threaten[], or attempt[] or conspire[] to use, a weapon of mass destruction . . . against any person or property within the United States."

---

[2]Under 18 U.S.C. § 1201(a), an individual commits a kidnapping if he "unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person " We have held that the word "otherwise" is interpreted broadly to mean that "it is sufficient for the government to show that the defendant acted for *any* reason which would in *any* way be of benefit." *Small*, 988 F.3d at 250 (citing *Gooch v. United States*, 297 U.S. 124, 128 (1936)).

For purposes of this provision, a "weapon of mass destruction" is defined as "any destructive device as defined in section 921." *Id.* § 2332a(c)(2)(A). A "destructive device" under § 921 is "any explosive . . . bomb," 18 U.S.C. § 921(a)(4)(A)(i), and "any combination of parts either designed or intended for use in converting any device into any destructive device described in subparagraph (A) . . . from which a destructive device may be readily assembled," *id.* § 921(a)(4)(C). To prove a conspiracy to use a weapon of mass destruction under § 2332a(a)(2)(C), the government must show: (1) an agreement between two or more individuals to use a weapon of mass destruction; (2) the defendant knowingly and voluntarily joined the agreement; and (3) the defendant "travel[ed] in or cause[d] another to travel in interstate . . . commerce in furtherance of the offense." 18 U.S.C. § 2332a(a)(2)(C); *United States v. Alebbini*, 979 F.3d 537, 544 (6th Cir. 2020).

While Fox provides no substantive arguments concerning his WMD conviction, he does state, generally, that there is insufficient evidence to convict him on both Counts 1 and 2. However, because Fox does not develop this argument as to Count 2, it is forfeited, and we need not address his challenge. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019) ("[A] defendant *forfeits* an argument by . . . identifying it without pressing it.") (citations omitted)).[3] Croft, on the other hand, argues that his WMD conspiracy conviction "fails," because there was no agreement involving Croft to obtain or use a WMD on the bridge leading to Governor Whitmer's home. Croft also describes his viewing of the explosives footage with "excitement" and his presence at the second reconnaissance of the Governor's home as, "at most[,] attendance at an overt act" involving the conspiracy to use WMDs. (ECF 28, Croft Appellant Br. 37, 45). The record, once again, belies his arguments. Regarding the agreement, during his first in-person meeting with Fox, Croft told the group that he was planning to "level buildings, burn motherf[]ckers' houses down with them inside of it . . . and . . . go terrorize people." (Gov. Ex.

---

[3]Even if he had not forfeited the argument, there was ample evidence to support his conviction. After the co-conspirators agreed they needed an explosives expert to complete the plan, Fox attempted to recruit a bombmaker, who refused to participate. Believing "Red" to be an alternative supplier, Fox ordered $4,000 worth of explosives, crawled under the bridge near Governor Whitmer's home in search of a place to detonate them, and photographed it. Then, Fox not only encouraged other co-conspirators who were "down with the cause" to contribute toward the $4,000 price tag, but also brought a good faith down payment to complete the purchase on the day of his arrest. (Gov. Ex. 223).

35). Fox followed-up with the observation that in order to carry out the kidnapping, they were going to require a demolitions expert and explosives, with no apparent objection from Croft.

Croft also traveled in interstate commerce in furtherance of the WMD conspiracy. He drove from Delaware to the Cambria FTX in Wisconsin to conduct demolitions training for the group in order to "have a chance against" Governor Whitmer's security detail. (Gov. Exs. 84, 85). During this trip, he took a bombmaking kit to the FTX and attempted to make an IED with Garbin and Franks. Months later, at the Luther FTX, Croft again showed up with an IED kit. And this time the group was successful: Croft detonated an IED with pennies that could pierce the skin at 25 feet in distance and used targets of human silhouettes to test the lethal nature of the IED. Based on this evidence, a rational juror could infer that Croft conspired to use a WMD.

**3.**

*Possession of an Unregistered Destructive Device*. The National Firearms Act subjects certain firearms to various tax, registration, and other regulatory requirements, criminalizing violation of its provisions. *See* 26 U.S.C. § 5861. Section 5861(d) makes it unlawful for a person to "possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." *Id.* § 5861(d). Congress has defined the term "firearm" broadly to include any "destructive device." 26 U.S.C. § 5845(a)(8). And similar to the definition of a WMD, a "destructive device" includes "any explosive, incendiary . . . bomb." *Id.* § 5845(f). In reviewing potential violations of the Act, we have determined that "a destructive device need not operate as intended to satisfy the statute," because possession, coupled with it being unregistered, makes its possession unlawful. *United States v. Unthank*, 107 F. App'x 625, 629 (6th Cir. 2004) (citing *United States v. Rushcamp*, 526 F.2d 1380, 1382 (6th Cir. 1975)).

Croft does not challenge whether the IED underlying his conviction was in fact a destructive device for purposes of the statute or even if it was registered with the federal government. In fact, Croft proffers no arguments at all to support his challenge to the sufficiency of the evidence on this count. So this argument is forfeited. *Berkshire*, 928 F.3d at 530. Nonetheless, a rational jury could conclude that Croft possessed an unregistered IED. Croft not only described the device in recorded conversations, but eyewitnesses—including his own

girlfriend—placed him at the scene where he detonated the IED. After searching the blast site, an FBI expert examined the evidence collected and testified that the bomb was indeed a destructive device. A records specialist with the Bureau of Alcohol, Tobacco, Firearms and Explosives established that the device was unregistered. Finally, agents found supplies used for making IEDs in Croft's home that matched those found at the blast site. Croft does not dispute this evidence on appeal. As such, we hold that there was sufficient evidence to show that Croft possessed an unregistered destructive device.

**4.**

*Government Entrapment*. Croft[4] maintains that even if we conclude that the government satisfied its burden to prove the conspiracy counts, the FBI agents entrapped him, which invalidates his conviction. Croft argues that the government's evidence at trial was insufficient to show that he was "'disposed to commit the criminal act prior to first being approached by Government agents." Croft Appellant Br. at 37 (quoting *Jacobson v. United States*, 503 U.S.

---

[4]The government argues, and we agree, that Fox did not raise the sufficiency of the evidence to defeat the entrapment defense on appeal. As such, any argument on this issue by Fox is deemed waived. *See United States v. Carter*, 89 F.4th 565, 568 (6th Cir. 2023) ("We do not consider waived arguments because the waiving party has conceded that there is no error to review."). Even if we were to reach this issue, the evidence against Fox was sufficient to show that he was predisposed to kidnap Governor Whitmer before being approached by government agents. Prior to the initial meeting in Dublin, Ohio, Fox repeatedly posted on Facebook about wanting to initiate the "boogaloo," about the III%ers, and about wanting to use "brute f[]cking force. Physical violence" to "win our rights back and take back what is ours." (R. 838, PageID 14474–77; Gov. Exs. 435, 437, 438). Fox also posted videos and pictures of himself with guns and cuffs threatening to "take our country back" from politicians. (R. 838, PageID 14438, 14474; Gov. Ex. 3). And after contact with Croft, Fox began sending private messages concerning "put[ting] together a team" to "get these f[]cking governors and arrest them and put 'em on trial for their crimes," concluding that we're gonna have to do it the f[]cking, old, citizens' arrest way." (R. 838, PageID 14499; Gov. Ex. 20). Fox subsequently continued to threaten violence against governors, posting a video on Facebook saying that people should direct their anger toward the "top" of "our tyrannical f[]cking government." (R. 838, PageID 14502–03; Gov. Ex. 22). And leading up to his first contact with a government informant he was already talking about being "ready to go snatch a motherf[]cker." (R. 838, PageID 14514–15; Gov. Ex. 491).

Fox not only talked, but also avidly participated in the plot from its infancy until his arrest. Fox proposed the idea of kidnapping Governor Whitmer from her vacation home. (R. 838, PageID 14543). He avidly participated in every key meeting, telling Croft that he wouldn't miss one meeting even though it might cost him a job. (Gov. Ex. 488). Fox also proposed, planned, and participated in both reconnaissance trips to Governor Whitmer's home. (Gov. Ex. 113; 223). And during these reconnaissance trips, he gleefully took steps toward kidnapping Governor Whitmer. (Gov. Ex. 197, 199). Those are hardly the actions of a reluctant innocent who has unwarily been hoodwinked into criminal behavior by a government agent. Taking Fox at his own words, there would be more than enough evidence to demonstrate that he was predisposed to commit kidnapping prior to any contact with government informants. And looking at Fox's behavior post-contact with the government only reinforces that Fox was an avid participant in the kidnapping conspiracy.

540, 549 (1992)).  While Croft focuses most of his brief on predisposition, he also argues that the government used "staggering" and "excessive" pressure to induce and entrap him.  Croft Appellant Br. at 41.  "The defense of entrapment exists to thwart the government from 'originat[ing] a criminal design, implant[ing] in an innocent person's mind the disposition to commit a criminal act, and then induc[ing] commission of the crime so that the [g]overnment may prosecute.'"  *United States v. Harris*, 9 F.3d 493, 497 (6th Cir. 1993) (quoting *Jacobson*, 503 U.S. at 540).  An entrapment defense "requires proof of two elements: (1) government inducement of the crime, and (2) lack of predisposition on the part of the defendant to engage in the criminal activity."  *United States v. Khalil*, 279 F.3d 358, 364 (6th Cir. 2002) (citing *United States v. Nelson*, 922 F.2d 311, 317 (6th Cir. 1990)).  Both must be present.

"An 'inducement' consists of an 'opportunity' *plus* something else—typically, excessive pressure by the government upon the defendant or the government's taking advantage of an alternative, non-criminal type of motive."  *United States v. Hood*, 811 F. App'x 291, 298 (6th Cir. 2020) (quoting *United States v. Dixon*, 396 F. App'x 183, 186 (6th Cir. 2010)).  "[T]actics typically found by courts to be excessive[] includ[e] threats, 'dogged insistence,' appeals to sympathy, or 'preying upon the love and loyalty of [a] special relationship.'"  *Id.* at 299 (citations omitted); *United States v. Geralt*, 682 F. App'x 394, 406 (6th Cir. 2017) (inducement requires "evidence of repeated and persistent solicitation" or "excessive pressure by the government" (quotation omitted)).  "[M]erely afford[ing] an opportunity or facilities for the commission of the crime" is not enough to prove that an inducement occurred.  *Mathews v. United States*, 485 U.S. 58, 66 (1988).  Similarly, a showing that the government essentially "made the crime easier" or "participated in the crime in some way" does not prove that a defendant was unlawfully entrapped; a defendant must show that he was not inclined to commit the crime.  Sixth Circuit Pattern Jury Instructions § 6.03(3); *Jacobson*, 503 U.S. at 547 n.1 (discussing jury instructions that were upheld).

Predisposition, referred to as "the principal element in the defense of entrapment, focuses upon whether the defendant was an unwary innocent or, instead, an unwary criminal who readily availed himself of the opportunity to perpetrate the crime."  *Mathews*, 485 U.S. at 63 (internal citations and quotation marks omitted).  Predisposition, "by definition, [involves] the defendant's

state of mind *before his initial exposure to government agents.*" *United States v. McLernon*, 746 F.2d 1098, 1112 (6th Cir. 1984) (internal quotation marks and citation omitted); *United States v. Johnson*, 855 F.2d 299, 303 (6th Cir. 1988).

To determine if a defendant was predisposed to commit a crime, we weigh the following non-exhaustive factors:

> [1] the character or reputation of the defendant, including any prior criminal record; [2] whether the suggestion of the criminal activity was initially made by the Government; [3] whether the defendant was engaged in the criminal activity for profit; [4] whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and [5] the nature of the inducement or persuasion supplied by the government.

*Khalil*, 279 F.3d at 365 (quoting *United States v. Barger*, 931 F.2d 359, 366 (6th Cir. 1991)).  As we have held, "[t]he most important factor in determining the lack of predisposition . . . is whether the defendant evidenced reluctance to engage in criminal activity which was overcome by repeated [g]overnment inducements." *McLernon*, 746 F.2d at 1113 (internal quotation marks and citation omitted); *United States v. Khan*, No. 20-1179, 2021 WL 4026781, at *5 (6th Cir. Sept. 3, 2021) (same); *see also United States v. Sherrod*, 33 F.3d 723, 725 (6th Cir. 1994) (emphasizing that the Sixth Circuit Pattern Jury Instructions repeatedly place significance on the idea that the defendant cannot "already [be] willing" to commit a crime).  Importantly, as is the case here, a defendant "whose predisposition to commit a particular crime was proved beyond a reasonable doubt, [cannot] defend against prosecution on the basis that the government induced him to commit that crime, *no matter how strong the inducement.*"  *United States v. Tucker*, 28 F.3d 1420, 1422 (6th Cir. 1994) (emphasis added).  In other words, a finding of predisposition wholly defeats an entrapment defense.

The record demonstrates that Croft was predisposed to join both conspiracies.  Regarding his character and reputation, as Croft himself acknowledges, he has "embraced an antigovernment philosophy" that uses "III% symbols,"[5] which references a militia group that has adopted a similar stance.  (ECF 28, Croft Appellant Br. 7).  So committed was he to its precepts,

---

[5]*See generally* Sarah Childress, *A Guide to the New Militia Movement*, PBS (May 17, 2017), https://www.pbs.org/wgbh/frontline/interactive/militia-movement/. [https://perma.cc/LZ2J-CZCC].

that he also had the III% symbol tattooed onto this hand.  In his briefing, Croft admits that he also wore a Hawaiian "boogaloo"[6] shirt—boogaloo is a movement centered around the idea of civil war between citizens and the federal government—to demonstrate his anti-government association.  And as early as 2019, Croft began discussing the idea of a "flash gathering in Ohio" with "two weeks max notice," which would be "[t]oo quick for the feds to cut red tape and infest."  (R. 838, PageID 14492).  The purported goal was to begin discussions of acts of terrorism.  In a recorded conversation, Croft discussed the fact that he had begun plotting to kidnap a state governor since approximately December 2019, stating that they should "take the militia and go grab that f[]cking governor right where he lives at."  (Gov. Ex. 112*).  Moreover, in a private Facebook message, Croft posted that executing state governors would ultimately lead to a second American Revolution.  In particular, Croft explained that if only one governor were to be hung, it would cause a "domino[]" effect.  (R. 844, PageID 15945).  In May 2020, Croft also posted a picture of a noose, followed by writing: "Which Governor is going to end up dragged off, and hung for treason first?"  (Gov. Ex. 360).  And leading up to the meeting in Dublin, Ohio, Croft told Fox that the meeting was to discuss attack plans.  All these incidents occurred before Croft ever met any government informants.  This factor weighs in favor of Croft's predisposition.

Regarding the suggestion of criminal activity, there is insufficient evidence in the record to establish that the government planted the idea of kidnapping and harming governors, including Governor Whitmer, or the use of bombs.  In fact, the initial suggestion to target state governors originated with Croft in 2019, and the plan to kidnap Governor Whitmer, in particular, originated with Fox; Croft later agreed that she was a "target of opportunity."  (R. 838, PageID 14543).  While there is no evidence in the record that Croft engaged in the conspiracy for a profit, he was vehement about seeing that Governor Whitmer suffered, even if it meant "walk[ing] away from life."  (Gov. Ex. 257).  There is also no evidence showing that Croft had any sense of reluctance at any point during the planning and preparation for the kidnapping.  Not once does the record reflect, or does Croft argue, that Croft expressed any hesitation or doubts about engaging in

---

[6]*See generally* Matthew Kriner & Jon Lewis, *The Evolution of the Boogaloo Movement*, 14 CTCSentinel 22 (2021), available at https://ctc.westpoint.edu/the-evolution-of-the-boogaloo-movement/. [https://perma.cc/2TDE-BPZ3].

criminal conduct. And Croft's level of involvement, including building and detonating a bomb, purchasing kidnapping supplies, and participating in the FTXs would suggest otherwise. *See McLernon*, 746 F.2d at 1113 (lack of reluctance carries the most weight in our predisposition determination); *see also United States v. Anderson*, 55 F.4th 545, 558 (7th Cir. 2022) (concluding that a defendant who "never expressed reluctance but was instead the instigator of the . . . scheme" lacked grounds for claiming that the agent's communications entrapped him). The fact that Croft was one of the progenitors of the kidnapping plan coupled with his lack of reluctance in seeing it through, cuts against a lack of predisposition.

"The nature-of-the-inducement factor concerns the means the government used to persuade its target to violate the law." *United States v. White*, 815 F. App'x 27, 30 (6th Cir. 2020) (citing *United States v. Barger*, 931 F.2d 359, 361, 367 (6th Cir. 1991)). Croft generally argues that the FBI was "behind every key event," including the FTXs and meetings Croft attended, both reconnaissance events, and the viewing of the video of the WMDs. (Croft Appellant Br. at 40). Yet, members of the conspiracy testified that they never saw informants Chappel or Robeson influencing Defendants, including instructing Defendants on what to do or suggesting any plans to kidnap. Rather, it was Defendants who designed and developed the ideas of antigovernment violence. This included specific details of the plans, such as Fox and Garbin explaining that the kidnapping should be completed prior to the November election, suggesting the use of explosives to bomb the bridge entering the city to prevent law enforcement from impeding their plans, and the use of a boat to extract Governor Whitmer and transport her to Lake Michigan.

Based on the evidence presented at trial, the jury saw and heard a host of video and audio recordings of Defendants promising violence, planning and participating in trainings, bringing their own weapons and material, and plotting the abduction without reluctance. The weight of the *McLernon* factors tilts heavily in the government's favor. Thus, the government readily established that Croft was predisposed to the kidnapping of governors, and the weak evidence of inducement he has adduced cannot detract from the strong evidence of predisposition. As such, his claim for entrapment fails.

**B.**

*Denial of a Remmer Hearing*.  A district court's decision not to conduct an evidentiary hearing is reviewed for abuse of discretion.  *See Williams v. Bagley*, 380 F.3d 932, 977 (6th Cir. 2004) (quoting *Alley v. Bell*, 307 F.3d 380, 389 (6th Cir. 2002)).

The Sixth Amendment of the United States Constitution provides that a criminal defendant has a right to be tried by an impartial jury.  U.S. Const. amend. VI.  "The presence of even a single biased juror deprives a defendant of their right to an impartial jury."  *United States v. Lanier*, 988 F.3d 284, 294 (6th Cir. 2021) (quoting *Williams*, 380 F.3d at 944) (cleaned up).  In criminal cases, "any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial."  *Remmer v. United States*, 347 U.S. 227, 229 (1954).  And in such cases, trial courts have an affirmative duty to investigate a juror's alleged misconduct.  *See United States v. Perry*, 438 F.3d 642, 651 (6th Cir. 2006) (citation omitted).

Courts are also required to hold a *Remmer* hearing when "a colorable claim of extraneous influence has been raised," to afford a defendant "a meaningful opportunity" to prove actual bias of the juror.  *United States v. Herndon*, 156 F.3d 629, 635, 637 (6th Cir. 1998).  However, not all "extraneous influence[s]" rise to the level of a "colorable claim," triggering the requirement for a *Remmer* hearing.  *United States v. Kechego*, 91 F.4th 845, 850 (6th Cir. 2024) ("[A] claim of external influence is not colorable merely because it is possible."); *see also United States v. Lanier*, 870 F.3d 546, 549 (6th Cir. 2017) ("[A] *Remmer* hearing is not necessary in every instance of possible unauthorized third-party contact.").  As we have recently explained, "[T]he claim must present a likelihood of having affected the verdict and must be supported by credible evidence . . . ."  *Kechego*, 91 F.4th at 850 (internal quotation marks and citations omitted).

On the second day of testimony, the district court held an in-camera hearing to address allegations of juror bias and misconduct based on a phone call received by Croft's counsel.  According to Croft's attorney, a juror had told the caller, who was a co-worker, that the juror "had already determined that the Defendants were guilty, and [the juror] was going to hang them."  (R. 848, PageID 16307).  After overruling objections and denying defense counsels'

request to question the juror, the district court held a meeting later that day and explained that the court's jury clerk interviewed the caller who admitted to not having actually spoken with the juror. Based on the clerk's interview, the caller did not know whether the individual was serving as a member of the jury. The caller's purpose in speaking out was just to convey what was said by a different co-worker who did not want to be identified.

After conducting its own in camera interview with the juror and observing that the juror's behavior during the proceedings was inconsistent with claims of bias, the district court ultimately found the juror to be credible. The court first noted that the juror's demeanor and behavior lent itself to a finding of credibility. The court inquired as to whether the juror made any statements about the trial or spoke to any co-workers about it, which the juror repeatedly denied. The court also noted the following: (1) that the juror's answers were consistent with those provided during voir dire; (2) that the juror could set aside any preconceived notions; (3) that the juror's interactions with other jurors did not provide any basis to believe that the juror had an intent to manipulate the proceedings; and (4) that the juror's behavior in the jury box—which included attentiveness to the parties' evidence and note-taking during the proceedings—did not suggest any predetermined decisions. Thus, the court satisfied itself that the juror would be able to proceed in a fair and impartial manner, as promised. *See, e.g.*, *United States v. Williams*, 195 F.3d 823, 827–28 (6th Cir. 1999) (affirming the district court's decision not to conduct a *Remmer* hearing because the juror assured the court that she could remain impartial).

Defendants challenge this finding arguing that the court abused its discretion by not holding a *Remmer* hearing and not allowing counsel to question the juror themselves. They argue that these failures deprived them of a "meaningful opportunity" to show that the juror was biased. *See Cunningham v. Shoop*, 23 F.4th 636, 649, 652 (6th Cir. 2022) (explaining that "a prima facie showing of juror bias entitles a defendant to an evidentiary hearing"). Croft maintains that he presented credible and plausible allegations that the juror was biased, which amounted to a "colorable claim" for purposes of *Remmer*. However, for a claim to be "colorable," it must be "credible," not merely plausible. *See Kechego*, 91 F.4th at 850. In addition to the allegedly "unmistakable bias and prejudgment" of the juror's purported statements, (ECF 28, Croft Appellant Br. 51), Croft presented a post-trial affidavit from a private

investigator who further inquired into the caller's claims against the juror. The affidavit included the following information: the caller knew of several other co-workers who allegedly heard the juror's comments; the juror's mother also worked for the same employer and the co-workers were afraid of losing their jobs, despite never claiming that the juror's mother had any authority to terminate them; the caller opined that the juror's political views were "far-left leaning," so he "obviously had his mind already made up" (R. 745-1, PageID 9752, ¶ 9); and the unnamed individuals also feared retaliation from "BLM" ("Black Lives Matter") if their names were revealed to the public. (*Id.* at 9753 ¶ 16). The district court, however, cannot be faulted for failing to consider this post-trial affidavit during trial because Croft placed it before the court only after trial had ended.

To overcome the district court's credibility determination, defense counsel offered a double-hearsay report from a caller who did not hear statements from the juror directly. The caller was also unsure if the juror was the person who allegedly made the statements. Adding further obscurity to this information, the co-worker who allegedly heard the juror's statement wanted to remain anonymous and was unwilling to speak to the jury clerk. And the individual refused to identify the other co-workers so that the court clerk could conduct a private interview to corroborate the allegations. "[B]ecause the district court, as the finder of fact, is best placed to determine witness credibility, this court will defer to the district court's credibility determinations absent reason to believe that they are clearly erroneous." *United States v. Vance*, 956 F.3d 846, 853 (6th Cir. 2020) (internal citations and quotation marks omitted). Defendants do not proffer any credible evidence to support their claim of juror bias, and as such, the district court did not abuse its discretion in denying Defendants' request for a *Remmer* hearing.[7]

## C.

*Time Restrictions for Cross-Examination*. We review allegations of Confrontation Clause violations de novo. *United States v. Roberts*, 84 F.4th 659, 666 (6th Cir. 2023).

---

[7]To the extent that Croft's counsel challenges his general ability to be present for the district court's interview, the Supreme Court has already determined that "the defense has no constitutional right to be present at every interaction between a judge and a juror, nor is there a constitutional right to have a court reporter transcribe every such communication." *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (per curiam) (quoting *Rushen v. Spain*, 464 U.S. 114, 125–26 (1983) (Stevens, J., concurring in judgment)).

However, where the allegations are based solely on arguments regarding a trial court's "time management decisions," we review for abuse of discretion. *Ross v. Parrot's Landing, Inc.*, No. 21-1774, 2022 WL 7367263, at *3 (6th Cir. Oct. 13, 2022); *see also Dorsey v. Parke*, 872 F.2d 163, 166 (6th Cir. 1989) ("[E]ven when the core values of the Sixth Amendment are invaded by a denial of cross-examination . . . the standard of review is abuse of discretion, abuse being found where the trial court has interfered with the defendant's constitutional right.").

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The defendant's ability to confront his accusers means that he enjoys the right to cross-examine those witnesses. *See Pointer v. Texas*, 380 U.S. 400, 404 (1965). The rights conferred by the Confrontation Clause, however, are not unfettered. *See Dorsey*, 872 F.2d at 166 ("[T]he Sixth Amendment has not been construed to give criminal defendants absolute control over cross-examination."); *see also United States v. Peterson*, 188 F.3d 510 (6th Cir. 1999) (unpublished table decision) (same). "Instead, the Constitution guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Matthews*, 31 F.4th at 452 (quoting *Jordan v. Warden, Lebanon Corr. Inst.*, 675 F.3d 586, 594 (6th Cir. 2012)); *see also Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). "The proper analysis in determining whether counsel was granted an opportunity for effective cross-examination asks whether the jury had enough information to assess the defense theory, in spite of any court-imposed limitations." *McPherson v. Woods*, 506 F. App'x 379, 390 (6th Cir. 2012) (citing *Dorsey*, 872 F.2d at 167).

Defendants maintain that the district court abused its discretion and violated their Sixth Amendment right to confront the government's witness, co-conspirator Kaleb Franks, by placing arbitrary time limits on the cross-examination. Croft argues that the time limit was arbitrary because it was imposed "without warning." (ECF 28, Croft Appellant Br. 68). The record, however, reflects that defense counsel were warned on multiple occasions that time limits may be imposed. On the second day of witness testimony (August 11, 2022), the court expressed its initial concern that the trial would exceed the two-week time frame. In chambers, the court

conveyed its surprise that the defense's line of questioning was not more focused, particularly regarding the duplicative nature of the questions. The following day, the court warned the parties that it would "think hard over the weekend about time limits" because their use of time during examinations was getting "ridiculous." (R. 840, PageID 15020). During the colloquy, the court noted that defense counsel's cross-examinations were lengthy and cluttered with non-germane questioning, which was causing the jury to "check[] out" of the proceedings. (*Id.* at 15020–21). The court also referenced "Judge Bertlesman's rule of proportionality," derived from *United States v. Reaves*, 636 F. Supp. 1575 (E.D. Ky. 1986), which limited cross-examination to the same duration used for the government's direct-examination. (R. 840, PageID 15020).

On August 14, 2022, the district court again mentioned the fact that jurors appeared "checked out" during "needlessly long and repetitive lines of examination" and noted that it was still considering Judge Bertlesman's rule. (R. 711, PageID 8988 n.6). The following day, the court again warned defense counsel that they had gone "through the entire litany of things the jury has already heard" from a witness, reminding Fox's counsel that the specific facts were already admitted into evidence. (R. 841, PageID 15056–57). On August 16, Fox's counsel continued with the same line of questioning from a prior witness's testimony, and the court reminded him that he already had the information required to make his argument, warned about unnecessary repetition of the questioning, and asked him to "move on." (R. 842, PageID 15313–17). Again, the court warned that it was "continuing to think about Judge Bertelsman." (*Id.* at 15317). By the time Franks was slated to testify on August 17, the court announced that the Bertelsman rule would be in effect for his examination—for both the government and the defense. This meant that defense counsel would have 25 minutes each for cross-examination because the government took 50 minutes on its direct. Because the parties were warned on a least five occasions that time limits could be placed on a witness's testimony, Croft's assertion that the limitation was arbitrary because he had no warning is baseless.

Next, Fox argues that if he had more time to cross-examine Franks, he would have elicited testimony covering topics ranging from Franks's role in the conspiracy to his arrest, and how it allegedly impacted Fox's entrapment defense. During the government's direct

examination of Franks, it covered many of the same points discussed with the government's other witness, co-conspirator Ty Garbin, who had just testified. This included eliciting testimony regarding Franks' agreement to enter the conspiracy (including the guilty plea), Defendants' participation, and the lack of any government inducement. During cross-examination, both defense counsel covered many of the same topics as the government, often overlapping in their questioning.

Indeed, while this court acknowledges that "[c]ounsel often cannot know in advance what pertinent facts may be elicited on cross-examination," making them "necessarily exploratory," *Dorsey*, 872 F.2d at 167, on occasions where, as is the case here, counsel has advance knowledge of pertinent facts and chooses to apportion examination time on evidence already in the record[8] and other non-pertinent issues, they cannot successfully argue on appeal that if provided more time, they would have elicited additional exculpatory evidence. *See, e.g.*, *McPherson*, 506 F. App'x at 390 (no abuse of discretion where counsel "was given adequate opportunity to explore [the witness's] conflicting statements, her credibility, and her observations on the day of the shooting"); *United States v. Spangler*, 638 F. App'x 611, 613 (9th Cir. 2016) (no abuse of discretion where the court cut off cross-examination when counsel's questioning became repetitive and counsel was provided with warnings); *United States v. Muhammad*, 928 F.2d 1461, 1467 (7th Cir. 1991) (rejecting the claim that counsel would have elicited exculpatory testimony if provided more time when he knew he would be "potentially" under time restrictions but focused on non-exculpatory issues).

Furthermore, the Supreme Court is clear that "[w]ithin limits, the judge may control the scope of rebuttal testimony, may refuse to allow cumulative, repetitive, or irrelevant testimony, and may control the scope of examination of witnesses." *Geders v. United States*, 425 U.S. 80, 86–87 (1976) (internal citations omitted). As long as "truth and fairness are not . . . sacrificed, the judge must exert substantial control over the proceedings." *Id.* at 87. That is what happened

---

[8]In the district court's order denying a motion for retrial, the court noted that, "[d]uring the first trial, four defense counsel were able to cross examine this particular witness [Franks] within this time constraint and there was no reason in the Court's mind that two defense counsel needed more time in this case." (R. 779, PageID 10219–20, 10238). Accordingly, the court concluded that 25 minutes a piece was enough time for defense counsel, given that they had a prior opportunity to examine Franks.

here. In addition to the fact that counsel chose to effectively squander their time despite the court's warnings, the court had the discretion to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *United States v. Collins*, 799 F.3d 554, 588 (6th Cir. 2015) (citation omitted) (trial courts have "very broad discretion in making this determination"). The record shows that the court raised the issue of wasting time, presenting cumulative evidence, and that the jury was "checking out" of the proceedings, which in retrospect, could have also been prejudicial to Defendants' right to receive a fair trial with an astute and attentive jury.

Finally, Fox attempts to distinguish the facts of this case from those in *Reaves* to support his claim that the district court improperly imposed arbitrary time limits on his ability to cross-examine the witness. Irrespective of these differences, as discussed, the facts in this record support the district court's decision given that it provided counsel with numerous warnings that it would likely impose time limits on witness examinations, and defense counsel had ample time and opportunity to effectively cross-examine Franks. We see no abuse of discretion.

**D.**

1. *Hearsay Exemption Under Fed. R. Evid. 801(d)(2)(D).* Defendants maintain that the district court erred by limiting the scope of the admissibility of certain government informant statements—only allowing those that were "regurgitations" of statements made by a federal agent—pursuant to Federal Rule of Civil Procedure 801(d)(2)(D) and our holding in *Branham v. United States*, 97 F.3d 835 (6th Cir. 1996). Generally, "[a] district court's evidentiary rulings will not be reversed absent a clear showing of abuse of discretion.'" *United States v. Dunnican*, 961 F.3d 859, 871 (6th Cir. 2020) (quoting *United States v. Damrah*, 412 F.3d 618, 625 (6th Cir. 2005)). "Abuses of discretion in evidentiary rulings . . . merit reversal only if the error is not harmless—'that is, only if the erroneous evidentiary ruling affected the outcome of the trial.'" *Id.* (quoting *United States v. Farrad*, 895 F.3d 859, 875 (6th Cir. 2018)). A district court's determination as to whether proffered evidence constitutes hearsay is a question of law that we review de novo. *United States v. Johnson*, 79 F.4th 684, 700 (6th Cir. 2023); *M.J. ex. rel. S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 445 (6th Cir. 2021).

"Hearsay" is defined as a statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay is inadmissible at trial unless otherwise provided by Congress, the rules of evidence, or other rules prescribed by the Supreme Court. Fed. R. Evid. 802. The inadmissibility of hearsay under Rule 802 "is premised on the theory that out-of-court statements are subject to particular hazards. The declarant might be lying; he might have misperceived the events which he relates; he might have faulty memory; his words might be misunderstood or taken out of context by the listener." *United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005) (quoting *Williamson v. United States*, 512 U.S. 594, 598 (1994)). Such "dangers," as we have explained, "are minimized for in-court statements." *Id.* Under Rule 801 a statement that is "offered against an opposing party," and "made by the party's agent or employee on a matter within the scope of that relationship and while it existed" is not hearsay. Fed. R. Evid. 801(d)(2)(D). In *Branham*, the government conceded that, for purposes of Rule 801(d)(2)(D), "the federal government is a party-opponent of the defendant in a criminal case." 97 F.3d at 851.[9] Similarly, here, the government has never argued, neither before us nor the district court, that it was not a party opponent. *See* Appellee Br. at 102–04; R. 368, PageID 2423–25.

Prior to trial, Defendants filed a motion in limine to admit the out-of-court statements of FBI agents and government informants as nonhearsay under Rule 801(d)(2)(D). Attached to the motion was a 44-page spreadsheet containing 258 statements to which the government objected as either hearsay, irrelevant, or both. After an evidentiary hearing, the district court granted in part and denied in part Defendants' motion. In reaching its decision, the court acknowledged this circuit's precedent in *Branham*, where the court considered confidential informant statements to be nonhearsay because the informant was acting within his agency relationship, and the government conceded that it was a party opponent. In an attempt to distinguish

---

[9]Some circuits do not treat government agents as a party opponent in criminal cases. *See United States v. Arroyo*, 406 F 3d 881, 888 (7th Cir. 2005) ("government agents are not party-opponents for purposes of Rule 801(d)(2)"); *United States v. Yildiz*, 355 F.3d 80, 82 (2d Cir. 2004) (explaining that statements by government agents "are historically unable to bind the sovereign"); *United States v. Booker*, 375 F. App'x 225, 230 (3d Cir. 2010) (explaining that statements by law enforcement officials "are not admissible on an admissions theory as substantive evidence against the sovereign in a criminal prosecution").

*Branham*, the district court began by characterizing informants as being more like "independent contractors" rather than agents or employees of the government. (R. 439, PageID 3012–13). It then pointed to out-of-circuit authority contrary to *Branham*'s approach and explained that such conflicting persuasive authority left the court hesitant to "expand" *Branham*. (*Id.*). The district court then noted that, in *United States v. Reed*, 167 F.3d 984 (6th Cir. 1999), our court explained that *Branham* does not mean "anything said" by an agent or confidential informant "would be admissible." *Id.* at 989 n.4. Following this line of thought, the district court reasoned that only "where the informant's statement merely regurgitates words that were fed by a government agent, then (provided the offering party can establish relevance) the statement might be admissible." (R. 439, PageID 3013).

In *Branham*, the defendant challenged the district court's decision to sustain the government's hearsay objection to defense counsel's general inquiry into conversations between Branham and a government informant—conversations which Branham argued would help show that an informant sought to entrap him at the direction of the government. 97 F.3d at 850. Branham argued that the statements were relevant for purposes of his entrapment defense and admissible as nonhearsay pursuant to Rule 801(d)(2)(D). *Id.* While the government argued that the conversations with the informant were outside the scope of the agency between the detective and the informant, a panel of this court disagreed. In rejecting the government's argument, the *Branham* court noted that the informant there had "conversed with [the defendant] on a regular basis in order to establish a trusting relationship," so "whatever [the informant] said during these conversations was in *furtherance of that goal*, and thus within the scope of the existing agency." *Id.* at 851 (emphasis added); *see also Reed*, 167 F.3d at 989 (discussing *Branham* and noting that the "conversations between [the] government informant and criminal defendant were designed to establish trust" as the investigative goal, which made them admissible).

Shifting to the relevance of the statements, the *Branham* court explained that "conversations concerning [the defendant's] entrapment defense would not constitute hearsay" because they were not offered for the truth of the matter asserted. *Branham*, 97 F.3d at 851. Instead, they were offered as evidence of Branham's state of mind in support of his entrapment defense and, here, "the significance of a statement 'lies solely in the fact that it was made,' rather

than in the veracity of the out-of-court declarant's assertion." *Id.* (quoting *United States v. Cantu*, 876 F.2d 1134, 1137 (5th Cir. 1989)).[10]

Relying on *Branham*, Defendants maintain that they were deprived of the right to present a defense when the district court limited the admissibility of the government informant's statements. First, Fox argues that under *Branham*, the government informant statements were admissible "because they were all agents of the government at the time the statements were made and the statements related to matters within the scope of their duties in the investigation." (ECF 26, Fox Appellant Br. 63–64). In *Branham*, as explained in *Reed*, we emphasized the fact that the informant's statements fell within the scope of the agency between the informant and the government because the communications with the defendant were in furtherance of the government's investigative goal—which, in that particular case, was to establish a trust relationship. *See Branham*, 97 F.3d at 851; *Reed*, 167 F.3d at 989. The fact that a statement came from a person acting as an informant for the government does not automatically qualify the statement for admission under Rule 801(d)(2)(D); *Branham* demands that any such statements be within the "scope of the existing agency," which means that they must be in furtherance of an investigative goal. 97 F.3d at 851.

In its order denying the motion in limine, the district court concluded that "the best reading of *Branham* and *Reed* is that Rule 801(d)(2)(D) covers *only* those situations where an informant's words and actions are directly and expressly authorized by a government agent." (R. 439, PageID 3013) (emphasis added). But no such limitation can be found in either *Branham* or *Reed* because neither case involved mere regurgitation by a government informant of an agent's

---

[10]While some circuit courts have yet to address the issue of whether informant statements should be admitted under Rule 801(d)(2)(D), of those that have, the majority disallow the admission of such statements. *See, e.g.*, *Lippay v. Christos*, 996 F.2d 1490, 1498 (3d Cir. 1993); *Yildiz*, 355 F.3d at 82 ("There is good reason . . . to distinguish sworn statements submitted to a judicial officer, which the government might be said to have adopted, and those that are not submitted to a court and, consequently, not adopted, for example, statements contained in an arrest warrant . . . and an informant's remarks."); *United States v. Rodriguez-Landa*, 2019 WL 1755518, at *4 (C.D. Cal. Apr. 19, 2019) (rejecting argument that government informant statements are party admissions and explaining "Only the Sixth Circuit has permitted" such statements "to constitute a party admission under Rule 801(d)(2)(D)."); *see generally* CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, 4 FEDERAL EVIDENCE § 8:56 (4th ed. 2021) ("Usually statements by informants should not be viewed as admissions by the government . . . informants are expected to deal in and report rumor, speculation, suspicion, and opinion, and often they themselves are implicated in criminal ventures and labor under a mix of motives that is hard to unravel."). Nevertheless, we continue to allow the admittance of government informant statements *but only* when they are made in furtherance of an investigatory goal. *See Branham*, 97 F.3d at 851.

words. The circumstance described by the district court is merely one example of when government informant statements may be used in furtherance of an investigative goal. We have not suggested that it is the only possible scenario. As such, the district court erred in placing such a limitation on informant statements here. Notably, because of the court's formulation of the rule—i.e., that only informants' statements made at the behest of the agency were admissible—there was not a particularized ruling as to the 258 informant statements at issue. Now, the remaining question before us is whether this error was harmless. *See Branham*, 97 F.3d at 851 ("[E]ven if the district court erred in sustaining the hearsay objection, we will not reverse if the error was harmless."); *United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir. 2015) ("Evidentiary errors remain subject to harmless error review."); *see also* Fed. R. Crim. P. 52(a).

2. *Harmless Error.* As an initial matter, the parties dispute whether the error in this case should be categorized as constitutional or non-constitutional, a distinction that could alter the legal standard that will apply to our analysis. Defendants argue that the district court's exclusion of evidence under Rule 801(d)(2)(D) deprived them of a right to fully present their defense and rises to the level of a constitutional error. Thus, Defendants ask that we apply the harmless error standard announced in *Chapman v. California*, which is more exacting and requires proof of harmlessness "beyond a reasonable doubt." 386 U.S. 18, 24 (1967); *see also id.* at 24–26 (applying the heightened standard where the prosecution referenced the defendant's failure to testify in violation of the Fifth Amendment's privilege against self-incrimination).

"[E]rroneous evidentiary rulings rarely constitute a violation of a defendant's right to present a defense." *United States v. Hardy*, 586 F.3d 1040, 1044 (6th Cir. 2009) (citing *Washington v. Schriver*, 255 F.3d 45, 56 (2d Cir. 2001)). We have found that the erroneous exclusion of evidence does not "cause . . . constitutional injury" when "[a] variety of avenues [are] available to [the defendant] to present his defense, including his own testimony." *United States v. Kerley*, 784 F.3d 327, 343 (6th Cir. 2015); *see also United States v. Reichert*, 747 F.3d 445, 454 (6th Cir. 2014) ("[O]f course, Reichert had at least one other avenue of putting his own statements and beliefs into evidence: by taking the stand himself."). Here, neither Fox nor Croft testified in support of their entrapment defense, nor do they claim that they were prevented from

doing so. And the evidence they may not have been able to testify to due to the district court's hearsay order could have been explored through cross examination of the confidential informants.[11] *See United States v. August*, 984 F.2d 705, 712 (6th Cir. 1992) (explaining that any error in excluding evidence was harmless where the substance of the evidence came before the jury in another form). Because Defendants had other avenues available to them to support their entrapment defense and chose not to use them, they cannot establish that the harm they purportedly suffered gave rise to a constitutional injury. *See Kerley*, 784 F.3d at 343; *Reichert*, 747 F.3d at 454. Defendants, it bears noting, secured the admission of several of their proffered statements through witness testimony. And they could have presented other proffered statements on direct or cross examination. As such, the heightened harmless error standard is inapplicable.

Although the district court erred in its announcement and application of the rule for admissibility of informant statements under *Branham*, "we may not grant a new trial on the basis of [a] non-constitutional trial error where we have a 'fair assurance' that the verdict was *not* 'substantially swayed' by the error." *United States v. Kettles*, 970 F.3d 637, 643 (6th Cir. 2020) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)); *United States v. Chavez*, 951 F.3d 349, 358 (6th Cir. 2020) (same). The burden lies with the "Government to explain why an error should not upset the trial court's determination." *Kettles*, 970 F.3d at 643 (quoting *Shinseki v. Sanders*, 556 U.S. 396, 410–11 (2009)).

At issue is the Defendants' assertion that the district court's overly broad exclusion of informant statements impeded their ability to present evidence of inducement in support of their defense of government entrapment. As discussed above, entrapment exists when the government "implant[s] in the mind of an innocent person the disposition to commit the alleged offense and induce[s] its commission." *Hampton v. United States*, 425 U.S. 484, 490 (1976) (quoting *Sorrells v. United States*, 287 U.S. 435, 442 (1932)); *see also United States v. Russell*, 411 U.S. 423, 436 (1973) ("It is only when the Government's deception *actually implants the criminal*

---

[11]We acknowledge that the Defendants could not have called Robeson to testify because he invoked his Fifth Amendment right and the substance of his excluded statements thus could not have come in through his cross examination. *See* U.S. Const. amend. V. Robeson had few excluded statements, however, and the substance of his excluded statements largely came in through Chappel's testimony. For example, most of Robeson's excluded statements encouraged the group to come up with a plan, which Chappell admitted that the government encouraged a plan at trial. (R. 839, PageID 14724).

*design in the mind of the defendant* that the defense of entrapment comes into play." (emphasis added)). The government argues that the statements proffered by Defendants, even if admitted, would not have had a material effect on the jury's verdict. We agree. The excluded statements, when reviewed as a whole,[12] do not adequately support Defendants' argument that they were entrapped by the government. Recall that entrapment has two elements, a lack of predisposition and inducement. Here, the government introduced substantial evidence suggesting that the Defendants were predisposed—that is, they did not meet the government as "unwary *innocents*." *Mathews*, 485 U.S. at 63.

The Defendants focus their argument on entrapment's other prong—inducement. To show inducement, a defendant must establish a "causal connection" between the proffered evidence and the defendant's state of mind. *White*, 815 F. App'x at 30. If the statement of an agent or informant is proffered to show the government's motive and does not "affect" the defendant's state of mind, it is not relevant. *United States v. Robinson*, 763 F.2d 778, 783 (6th Cir. 1985); *see also* Fed. R. Evid. 401.

Here, as the government explains, many of the statements at issue were never communicated to Defendants. For instance, Defendants proffer statements that reference discussions between Robeson, Plunk, and Frank Butler, who was subject to a separate investigation. (*See* R. 383-1: PageID 2578–79 (Items 11–15)). In particular, one statement— "I don't know where he's really at, but I just know that [he's] backing off as hard as he has from other stuff, I have concerns with"—relates to an informant's opinion that Croft was nervous that law enforcement may have been watching. (*Id.* at 2580, Item 15). This and similar statements were not conveyed to Croft and therefore could not have induced Croft to participate in the conspiracies or possess a WMD. And, although this statement may be relevant as to Croft's predisposition, *see McLernon*, 746 F.2d at 1113 (explaining the "most important factor" in determining predisposition is "whether the defendant evidenced reluctance to engage in criminal activity which was overcome by repeated inducements"), one text containing the perceptions of

---

[12]We do not independently address all 258 informant statements. Instead, we focus on many of the statements identified in Defendants' supplemental briefing, which they appear to believe to be most relevant to their entrapment defense.

government agents about Croft's state of mind is not enough to overcome the evidence presented at trial of Croft's active and engaged role in the conspiracy.

Other statements pertained only to original co-defendant, Daniel Harris, who was not a party to the second trial. (*See id.* at 2589–92 (Items 36, 43, 49, 54, and 67)). Nevertheless, while only one statement—"Beaker [Harris] probably wouldn't" go with the group on the second reconnaissance of the Governor's home—was conveyed by Chappel to Fox, this statement would only be probative to Harris's defense, not to Fox's state of mind. (*Id.* at 2590, Item 54). Item 158 is a statement from Robeson to Chappel and Plunk where Robeson states that he would not "induce any . . . illegal activity that we don't have to," which Defendants allege is offered to show "Robeson's "willingness to 'induce' illegal activity." (*Id.* at 2607). This evidence is irrelevant because, at best, it would be probative of Robeson's state of mind but not of the Defendants' in support of their entrapment defense; again, nothing was conveyed to Defendants.

Next, the government maintains that many of the omitted statements merely reflect instances where an informant provided Defendants with the facilities or opportunities to further their plans or show that the informant acted in agreement with committing a crime. As discussed above, providing opportunities and facilities for an individual to commit a crime is insufficient to show inducement for purposes of government entrapment: such actions must be coupled with excessive pressure. *See Mathews*, 485 U.S. at 66; *Hood*, 811 F. App'x at 298.

Defendants argue that Robeson and Chappel applied such pressure by incessantly pushing them to come up with a specific plan. They point to numerous statements where both informants used strong language and encouraged action. *See* R. 383-1, PageID 2578–79, 2956–58. Some of these statements concerned a separate investigation into Frank Butler related to a plot in Virginia and are thus irrelevant to this case. [Appellee Br. at 34.] For most, however, the Defendants are correct that the government encouraged them to settle on a plan. But as the government points out in its supplemental briefing, the jury heard the substance of most of these statements and yet still convicted both Fox and Croft. [Appellee Supp. Br. at 24–27.] What's more, defense counsel had Chappel, who made the vast majority of the excluded statements, on the stand for two days and did not seek to elicit this testimony further through cross. *See United States v. Coplan*, 703 F.3d 46, 85–86 (2d Cir. 2012) (explaining that even if a district court's

evidentiary ruling was erroneous, it was harmless because "it is clear that the defendants had ample opportunity to make these arguments through their cross-examination"). Defendants also proffered a statement where Robeson and Chappel discussed whether and when they should use Garbin's property near Traverse City for the FTX, "to show CHS Dan and CHS Steve pushing [the] government-sponsored Luther FTX." (R. 383-1, PageID 2589, Item 45). But the record contradicts this assertion. At trial, Garbin testified that he volunteered his property for the site of the FTX without any pressure from the government.

Defendants also allege that certain statements support their argument that the government pushed them to act when they did. But it was Fox who initially conveyed that he did not "feel like [they] should be waiting until November" in explaining that the group "should be actively staging and planning." (Gov. Ex. 64). Defendants also proffer Items 50, 51, and 53 to show that Chappel was "pushing Adam Fox for [a] Government-led trip up north" and "induc[ing] activity." (R. 383-1, PageID 2590). But the jury heard many statements where Chappel encouraged Fox to perform reconnaissance on Governor Whitmer's vacation home and still found Fox guilty. (R. 841, PageID 15108–09; R. 842, PageID 15318).

Similarly, Defendants proffer Item 73 where Roberson said, "[y]ou can't just grab brick and mortar. Without a f[]cking human to go with it, you've done nothing but grab brick and mortar," in order "[t]o show CHS Steve advancing the idea of kidnapping." (*Id.* at 2593). Even assuming that the government did "advance" the planning, this would not be probative to show inducement. Rather, as stated, the government induces an individual when it "*implants* the criminal design in the mind of the defendant." *Russell*, 411 U.S. at 436 (emphasis added). The record shows that both Fox and Croft had already proposed the idea to "snatch" governors, so the informant's statement did not *implant* any ideas in their minds that did not already exist. (Gov. Ex. 491; Gov. Ex. 11).

Moreover, to the extent that Defendants attempt to argue that the informant's pretending to be a criminal or taking part in the planning supports that they were induced, this argument lacks merit. Government agents and informants, as part of their investigation, may maintain a "plausible cover story to explain [their] own motives" for participating in the crime without engaging in unlawful inducement. *United States v. Hall*, 608 F.3d 340, 344 (7th Cir. 2010).

Agents may also employ "[a]rtifice and stratagem . . . to catch those engaged in criminal enterprises." *United States v. Thompson*, 366 F.2d 167, 175 (6th Cir. 1966); *accord* Sixth Circuit Pattern Jury Instruction § 6.03(4) ("It is sometimes necessary during an investigation for a government agent to pretend to be a criminal, and to offer to take part in a crime . . . . This is permissible."). Thus, these statements merely demonstrate that the informants afforded facilities, opportunity, or acted in agreement: such tactics are not probative to inducement.

The government also maintains that many of the statements proffered by Defendants, on their face, were not probative to show inducement as they do not demonstrate the government's application of excessive pressure or any other coercive tactics. We agree. For instance, Defendants proffer Items 3 and 147, which are statements discussing "seating assignments" during the second reconnaissance of Governor Whitmer's vacation home to show that informants and the government "were in charge of planning and organizing the field trip on 9/12/2020." (R. 383-1, PageID 2576, 2606). The face of this statement is at odds with Defendants' characterization of the evidence. The fact that the informants, as part of the group going to surveil the Governor's home, discussed which car everyone would ride in does not suggest that they were "in charge" of the entire operation, nor does it show, more importantly, that Defendants were persuaded to participate in the criminal activity because of the statements. In fact, Chappel testified that Fox ultimately determined which vehicle everyone would ride in, which according to Defendants' logic, would show that Fox was the individual "in charge" of the seating arrangements and planning.

Defendants also proffered Item 100 in which Robeson warned the group that "in two months your states are going to be locked back down again" in order "to show CHS provoking/Inciting targets to make compromising or incriminating statements." (R. 383-1, PageID 2598). The statement, however, does not ask Defendants to do anything let alone rise to the level of "excessive pressure." *Hood*, 811 F. App'x 291. And again, making statements to maintain a level of trust between an informant and a target does not amount to impermissible inducement. *See Sherman v. United States*, 356 U.S. 369, 383–84 (1958) (Frankfurter, J., joined by Douglas, Harlan, and Brennan, JJ., concurring) (explaining that the government may "act in such a manner as is likely to induce to the commission of crime only [those who are "ready and

willing to commit further crimes"] and not others who would normally avoid crime and through self-struggle resist ordinary temptations"). The omitted statements proffered by Defendants do not overcome the evidence presented at trial on which the jury convicted them and would not have substantially swayed the jury to support Fox's and Croft's entrapment defense.

Finally, as discussed above, this finding is buttressed by the evidence of Defendants' guilt and their predisposition to engage in criminal activity. *See* discussion *supra* Section II.A.4 and n.6. It bears emphasizing that a finding of predisposition fully defeats the entrapment defense. *Tucker*, 28 F.3d at 1422. A lack of predisposition, the principal ingredient of entrapment, asks whether law enforcement planted "a criminal design in the mind of an otherwise law-abiding citizen or whether the government merely provided an opportunity to commit a crime to one who" was already willing to do so. *United States v. Al-Cholan*, 610 F.3d 945, 950 (6th Cir. 2010). Here, the government presented powerful evidence that Fox and Croft were predisposed to commit the crimes charged. Thus, even if the proffered statements would have helped Fox and Croft prove some inducement, we do not see how they would have swayed the jury's predisposition finding.

Between Defendants' extremist group affiliations, threatening social media posts, and numerous self-incriminating private communications, it is evident that Defendants were ready and willing to commit these crimes long before being introduced to any government informants. For example, before contact with the government informants in this case, Croft messaged Fox stating "We're gonna try and keep 'em guessing . . . . Once we get the foothold, one criminal governor in our possession, we've captured the flag in that state." (Gov. Ex. 14). Soon after, but before contact with government agents, Fox privately messaged a separate colleague arguing that "we need to get these f[]cking governors and arrest them and put 'em on trial for their crimes . . . we can't seem to get any constitutional sheriffs to go arrest her, so we're gonna have to do it the f[]cking, old, citizen's' arrest way." (Gov. Ex. 20). As evidenced by these messages, none of the proffered informant statements suggest that the government "implant[ed]" any criminal design in the minds of Fox and Croft: the criminal thoughts were their own. *Russell*, 411 U.S. at 436.

The government has sufficiently demonstrated that the jury's verdict was not "substantially swayed" by the district court's error. We, therefore, conclude that the exclusion of the informants' statements was harmless. *Kettles*, 970 F.3d at 643.

## III.

For the foregoing reasons, we **AFFIRM** the convictions of Fox and Croft on all counts.